# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA

NATALIE MENASHE, individually and as parent and
natural guardian of minor R.M and as heir and personal
representative of the Estate of Amir Menashe, R.M.,
minor by his parent and natural guardian, Natalie
Menashe, ESTATE OF AMIR MENASHE, by its
personal representative, Natalie Menashe, YITZCHAK
MENASHE, YEHUDIT MENASHE, TALI MENASHE
APTER, OFIR MENASHE, YAAKOV "KOBI" PREIS,
individually and as heir and co-personal representative of
the Estate of Elior Preis, EDNA PREIS, individually and
as heir and co-personal representative of the Estate of
Elior Preis, ESTATE OF ELIOR PREIS by its personal
representatives, Yaakov Preis and Edna Preis, SARIT
PERI, LIAT FROST, BINYAMIN HAROUSH,
individually and as heir and co-personal representative of
the Estate of Maor Haroush, ORIT HAROUSH,
individually and as heir and co-personal representative of
the Estate of Maor Haroush, ESTATE OF MAOR
HAROUSH, by its personal representatives, Binyamin
Haroush and Orit Haroush, ELIN TIRAN, SHIRLI
TIMOR, SAGIT RUBIN, CHEN GOLD, GILAT
KOLANGI, individually and as parent and natural
guardian of minor N.K., N.K, minor by her parent and
natural guardian, Gilat Kolangi, ESTATE OF
YITZCHAK KOLANGI, by its personal representative,
Gilat Kolangi, YAAKOV KOLANGI, RINA
KOLANGI, NIVA SIGAWI, YAEL MAMAN, DAVID
KOLANGI, YITZCHAK SHRIKI, individually and as
heir and personal representative of the Estate of Kochava
Shriki, ESTATE OF KOCHAVA SHRIKI, by its
personal representatives, Yitzchak Shriki, Zehava
Binyamin, Dorit Cohen, Avraham Oss, Nurit Cohen,
Yael Morad, and Ruth "Ruti" Gamliel, ZEHAVA
BINYAMIN, individually and as personal representative
of the Estate of Kochava Shriki, DORIT COHEN,
individually and as personal representative of the Estate
of Kochava Shriki, AVRAHAM OSS, individually and
as personal representative of the Estate of Kochava
Shriki, NURIT COHEN, individually and as personal
representative of the Estate of Kochava Shriki, YAEL
MORAD, individually and as personal representative of
the Estate of Kochava Shriki, RUTH "RUTI"
GAMLIEL, individually and as personal representative

Civ. No: 1:22-cv-22220-RNS

**Jury Trial Demanded**

of the Estate of Kochava Shriki, ESTHER TIBI, SIMON
JINI, ADI ALGRASI, LEVANA ALGRASI, YOSEF
ALGRASI, STAS ANTONOV, ANAT COHEN,
DANIEL FAHIMA, AMIT KUZA, VERED KUZA,
HANA LEVI,  GAL MALKA, MOSHE MOSERI,
SHALOM SARID, MALKA SARID, AVI SHAHAR,
ZIV  SHAHAR,  HADAR  SHAHAR,  YORAM
SHAHAR-SABACH, MIRIAM SHAHAR-SABACH,
MATAN SHAHAR-SABACH, LINOY SHAHAR-
SABACH, CHEN SHAHAR-SABACH, ROMAN
SHUSTER, RAYMOND SIBONI, GAD "GADI"
SIBONI, VADISLAV BATLIN, PENINA MOSHE,
RON FARHAN, ADAM BEN SHEETRIT, YAEL BEN
SHEETRIT, VADIM TALALAEV, individually and as
parent and natural guardian of minor, E.T., YEVGENYA
TELALAEV, individually and as parent and natural
guardian of minor E.T., E.T., minor, by her parents and
natural guardians, Vadim Yelalyev and Yevgenya
Telalyev, DORIT HAROUSH, BENZION HAROUSH,
RACHEL JERBI, MICHAEL PIZITSKY, RACHEL
EIDELMAN, SEMYON EIDELMAN, MARINA
NAHSHONOV    SIMHAYEV,    and    LUDMILA
NAHSHONOV

                              Plaintiffs,

    vs.

GEORGES ZARD ABOU JAOUDE, MOHAMAD
HAMDOUN, and AHMAD SAFA,

                              Defendants.

_____/

## AMENDED COMPLAINT

### A.  INTRODUCTION

1.      This is a civil action brought pursuant to the Alien Tort Claims Act ("ATCA"), 28

U.S.C. § 1350 and the Torture Victim Protection Act ("TVPA"), Pub. L. No. 102-256, 106 Stat.

73 (1992) (codified at 28 U.S.C. § 1350, note), seeking compensatory and punitive damages for

wrongful death, personal injury, and related torts that resulted from a terrorist bombing attack (the

"Attack" or the "Burgas Airport Attack") carried out by the Hezbollah terrorist organization on July 18, 2012, at the Sarafovo Airport in Burgas, Bulgaria.

2.      On July 18, 2012, a group of Jewish Israeli tourists landed at the Sarafovo Airport in Burgas, Bulgaria, and were boarding their tour bus when a Hezbollah operative, Mouhamad El Husseini, approached the bus and detonated his explosive device in close proximity to the tourists. The tour bus was engulfed in flames. Six civilians, including five Israeli tourists and the Bulgarian bus driver, were killed in the Attack. Numerous others suffered grievous injuries.

3.      The bomber, El Husseini, was a member of Hezbollah's "external security" unit. El Husseini died in the attack.

4.      A Bulgarian criminal court convicted, in absentia, two other Hezbollah members – Meliad Farah and Hassan El Hajj Hassan – for their respective roles in the Attack.

5.      Law enforcement authorities recovered three fake U.S. driver's licenses and a U.S. social security card during the investigation. They determined that ammonium nitrate, Hezbollah's explosive of choice, was an active ingredient in the explosive device used in the Attack. *See* Verified Criminal Complaint, *United States v. Samer El Debek*, Case No. 17-MAG-4154 (S.D.N.Y) at 8, 11.[1]

6.      Law enforcement authorities determined that Hezbollah carried out the Attack. *Id.*

---

[1] Samer El Debek and Ali Kourani, both members of Hezbollah, were arrested in 2017 after they were caught casing targets including the Panama Canal, U.S. military and intelligence outposts, and New York airports. They were part of the same Hezbollah network that carried out the Burgas Airport Attack. See Testimony of Joseph M. Humire, Congressional Hearing on "Financial Nexus of Terrorism, Drug Trafficking, and Organized Crime," at 8 (March 20, 2018), https://financialservices.house.gov/uploadedfiles/03.20.2018_joseph_humire_testimony.pdf

7.      Hezbollah has been designated as a terrorist organization under the U.S. Terrorism Sanctions Regulations, 60 Fed. Reg. 5079 (Jan. 23, 1997), the Foreign Terrorist Organizations Sanctions Regulations, 62 Fed. Reg. 52,650 (Oct. 8, 1997), the Global Terrorism Sanctions Regulations, 67 Fed. Reg. 12,633 (Mar. 19, 2002), and the Iran and Syria Nonproliferation Act, 72 Fed. Reg. 20,158 (Apr. 23, 2007).

8.      According to a White House national security official, "Hizballah, originally formed as a violent union of Iranian-backed extremists in Lebanon, has terrorized the Middle East and the world since its inception thirty-five years ago." *See* Thomas Bossert, "It's time to Mobilize a Global Response to the Terrorist Group Lebanese Hizballah" (Oct. 10, 2017), available at https://www.whitehouse.gov/articles/time-mobilize-global-response-terrorist-group-lebanese-hizballah; *see also* U.S. Dep't Treasury, "Treasury Targets Hizballah for Supporting the Assad Regime" (Aug. 10, 2012), available at https://www.treasury.gov/press-center/press-releases/Pages/tg1676.aspx.

9.      Hezbollah's terror attacks on civilians are notorious and well-documented. Hezbollah's terror attacks on civilians have included widespread, systematic attacks that constitute crimes against humanity.

10.     The Plaintiffs herein consist of the victims of the Burgas Airport Attack, their estates, and their close family members.

11.     The Defendants herein, Georges Zard Abou Jaoude ("Abou Jaoude"), Mohamad Hamdoun ("Hamdoun"), and Ahmad Safa ("Safa"), were the senior officers of and fully controlled the Lebanese Canadian Bank, SAL ("LCB" or the "Bank"). The Defendants exploited their control of LCB to launder Hezbollah assets and to finance Hezbollah's violations of the law of nations and treaties of the United States, including the Attack herein and other attacks against civilians.

4

Defendants knowingly and purposefully financed Hezbollah's genocidal terrorist attacks against civilians, as documented by the U.S. Government and others, by means of the scheme discussed below in this Complaint.

12.    LCB is a corporate entity based in Beirut, Lebanon. LCB previously operated as a bank, offering personal and corporate banking services with branches throughout Lebanon. At its peak, LCB was the eighth largest bank in Lebanon, with assets worth more than $5 billion.

13.    Defendants conspired with Hezbollah to utilize LCB to provide extensive banking and other financial services to Hezbollah, which caused, enabled, and facilitated the Attack in which the Plaintiffs were harmed and the decedents were murdered. As described below, the Defendants knowingly and substantially assisted Hezbollah, and directly and indirectly provided it with material support in violation of the law of nations and treaties of the United States.

14.    In 2011 LCB was forced into liquidation as a result of two separate enforcement actions by the U.S. Government: (a) findings by the U.S. Treasury Department that LCB was engaged in money laundering activities for Hezbollah ("Treasury Finding")[2]; and (b) a civil forfeiture action filed by the U.S. Attorney's Office for the Southern District of New York.[3] The Treasury findings, and the Verified Amended Complaint in the forfeiture action ("Amended Forfeiture Complaint") are annexed to, and incorporated into this Complaint as Exhibits A and B.

15.    The United States Government has correctly determined that, at least, from 2007 through 2011, the Defendants and their co-conspirators used United States car dealerships, bank

---

[2] See https://www.fincen.gov/sites/default/files/shared/LCBNoticeofFinding.pdf. Last visited April 2, 2023.

[3] See https://www.justice.gov/sites/default/files/usao-sdny/legacy/2015/03/25/U.S.%20v.%20Lebanese%20Canadian%20Bank%2C%20et%20al.%20Amended%20Complaint.pdf. Last visited April 2, 2023.

accounts, and other entities to aid and abet crimes against humanity and/or war crimes by laundering funds for Hezbollah. A central purpose of the scheme was to finance Hezbollah attacks on civilians and other crimes against humanity, including the Attack that gives rise to this case.

16.     A significant element of the Hezbollah money laundering scheme worked as follows: *First*, money flowing through LCB was routed through United States banks and used to purchase used cars in Florida and a handful of other U.S. states. *Second*, the cars were then shipped to West Africa, where they were sold. *Third*, proceeds from Hezbollah's narcotics sales in Europe and elsewhere were mixed with the money received from the sale of the cars, then the newly laundered drug money was reintroduced into the legitimate banking sector through LCB. *Finally*, some of the laundered funds were sent back to the United States to purchase more cars and to continue the cycle; other laundered funds were siphoned from the Bank to support Hezbollah. Hezbollah, in turn, used laundered monies to fund its genocidal and terrorist agenda, including the Burgas Airport Attack. *See generally Amended Forfeiture Complaint*. The details of the money laundering scheme are further described in the Enforcement Actions.

17.     The Defendants are liable under the Alien Tort Statute, 28 U.S.C. § 1350 because willfully financing genocidal terrorist attacks against civilians, and, in particular, financing terrorist bombings at international airports and elsewhere, violates the law of nations because it contravenes established, well-defined norms of international law.

18.     Additionally, by knowingly and intentionally providing these extensive financial services to Hezbollah, the Defendants joined Hezbollah and others in a conspiracy to commit genocidal terrorist attacks against civilians, to carry out bombing attacks against civilians, to carry out terrorist attacks against international airports, and to finance genocidal terrorist activities.

19.     Additionally and alternatively, the Defendants are liable under the Alien Tort Statute, 28 U.S.C. § 1350 because willfully financing terrorist attacks against civilians, and, in particular financing terrorist bombings at international airports violates treaties of the United States, including the Convention for the Suppression of Unlawful Act Against the Safety of Civil Aviation, as supplemented by the Montreal Protocol for the Suppression of Unlawful Acts of Violence at Airports serving International Civil Aviation (the "Montreal Convention"), *Convention Done at Montreal Sept. 23, 1971*, T.I.A.S. No. 7570, 24 U.S.T., 565 (Jan. 26, 1973); the International Convention for the Suppression of the Financing of Terrorism (the "Terrorism Financing Convention"), G.A. Res. 54/109, 1, U.N. Doc A/RES/54/109 (Dec. 9, 1999); and the International Convention for the Suppression of Terrorist Bombings (the "Terrorist Bombing Convention"), G.A. Res. 52/164, 1, U.N. Doc A/RES/52/164 (Dec. 15, 1997).

20.     Thus, pursuant to the ATCA, Plaintiffs, who are all aliens, sue the Defendants in tort for the Defendants' respective roles in the Attack, and/or in aiding and abetting Hezbollah, or conspiring with Hezbollah, in carrying out the Attack.

21.     The Defendants' financial support for Hezbollah enabled Hezbollah to commit terror attacks against civilians, including the Burgas Airport Attack. Defendants operated the money laundering scheme with the knowledge and intent that the laundered funds provided to Hezbollah would enable it to carry out such genocidal attacks and other crimes against humanity.

22.     The Defendants' financing of Hezbollah enabled the Attack and caused the deaths, grievous injuries, and other harm suffered by the Plaintiffs herein.

**B. PARTIES**

**1. Plaintiffs.**

23.     Amir Menashe was a citizen of Israel. He was killed in the Attack. He was 27 years old at the time, and is survived by his wife and minor son as well as his parents and siblings. Amir Menashe's widow, Natalie Menashe, brings this action as heir and personal representative of his estate.

24.     Plaintiff Natalie Menashe is a citizen of Israel. She is the widow of Amir Menashe. Natalie Menashe brings this action individually, on behalf of her minor child, R.M., and as personal representative of the estate of her deceased husband, Amir Menashe. Natalie Menashe was injured in the Attack.

25.     Plaintiff R.M. is a minor and a citizen of Israel. R.M. is the orphaned son of Amir Menashe and Natalie Menashe. R.M. was 10-months old when his father was murdered, and his mother was injured in the Attack.

26.     Plaintiff Yitzchak Menashe is a citizen of Israel. He is the father of decedent Amir Menashe.

27.     Plaintiff, Yehudit Menashe, is a citizen of Israel. She is the mother of decedent Amir Menashe.

28.     Plaintiff Tali Menashe Apter is a citizen of Israel. She is the sister of decedent Amir Menashe.

29.     Plaintiff Ofir Menashe is a citizen of Israel. He is the brother of decedent Amir Menashe.

30.     Elior Preis was a citizen of Israel. He was killed in the Attack. He was 26 years old at the time, and is survived by his parents and two sisters. Elior Preis's parents bring this action as heirs and personal representatives of his estate.

31.     Plaintiff Yaakov Preis is a citizen of Israel. He is the father of Elior Preis. Yaakov Preis brings this action individually and as personal representative of the estate of his son, Elior Preis.

32.     Plaintiff Edna Preis is a citizen of Israel. She is the mother of Elior Preis. Edna Preis brings this action individually and as personal representative of the estate of her son, Elior Preis.

33.     Plaintiff Sarit Peri is a citizen of Israel. She is a sister of Elior Preis.

34.     Plaintiff Liat Frost is a citizen of Israel. She is a sister of Elior Preis.

35.     Maor-Machluf ("Maor") Haroush was a citizen of Israel. He was killed in the Attack. He was 26 years old at the time. Maor Haroush is survived by his parents and four sisters. Maor Haroush's parents bring this action as heirs and personal representatives of his estate.

36.     Plaintiff Binyamin Haroush is a citizen of Israel. He is the father of Maor Haroush. Binyamin Haroush brings this action individually and as personal representative of the estate of his son, Maor Haroush.

37.     Plaintiff Orit Haroush is a citizen of Israel. She is the mother of Maor Haroush. Orit Haroush brings this action individually and as personal representative of the estate of her son, Maor Haroush.

38.     Plaintiff Elin Tiran is a citizen of Israel. She is a sister of Maor Haroush.

39.     Plaintiff Shirli Timor is a citizen of Israel. She is a sister of Maor Haroush.

40.     Plaintiff Sagit Rubin is a citizen of Israel. She is a sister of Maor Haroush.

41.     Plaintiff Chen Gold is a citizen of Israel. She is a sister of Maor Haroush.

42.     Yitzchak Kolangi was a citizen of Israel. He was killed in the Attack. He was 28 years old at the time. Yitzchak Kolangi is survived by his wife, Gilat, and a minor daughter as well as his parents and siblings. Yitzchak Kolangi's widow, Gilat Kolangi, brings this action as heir and personal representative of his estate.

43.     Plaintiff Gilat Kolangi is a citizen of Israel. She is the widow of Yitzchak Kolangi. Gilat Kolangi brings this action individually, on behalf of her minor child, N.K., and as the personal representative of the estate of her deceased husband Yitzchak Kolangi. Gilat Kolangi was seriously injured in the Attack.

44.     Plaintiff N.K. is a minor and a citizen of Israel. N.K. is the orphaned daughter of Yitzchak Kolangi and Gilat Kolangi.

45.     Plaintiff Yaakov Kolangi is a citizen of Israel. He is the father of decedent, Yitzchak Kolangi.

46.     Plaintiff Rina Kolangi is a citizen of Israel. She is the mother of decedent, Yitzchak Kolangi.

47.     Plaintiff Niva Sigawi is a citizen of Israel. She is a sister of decedent Yitzchak Kolangi.

48.     Plaintiff Yael Maman is a citizen of Israel. She is a sister of decedent Yitzchak Kolangi.

49.     Plaintiff David Kolangi is a citizen of Israel. He is the brother of decedent Yitzchak Kolangi.

50.     Kochava Shriki was a citizen of Israel. She was killed in the Attack. She was 43 years old at the time, and was pregnant with her first child following lengthy fertility treatments. The fetus was lost in the Attack. Kochava Shriki is survived by her husband, Yitzchak Shriki and

six siblings. Kochava Shriki's widower and her seven siblings bring this action as heirs and personal representatives of her estate.

51.     Plaintiff Yitzchak Shriki is a citizen of Israel. He is the widower of Kochava Shriki. Yitzchak Shriki brings this action individually and as a personal representative of the estate of his deceased wife, Kochava Shriki.

52.     Plaintiff Zehava Binyamin is a citizen of Israel. She is a sister of decedent Kochava Shriki.  Zehava Binyamin brings this action individually and as a personal representative of the estate of her sister, Kochava Shriki.

53.     Plaintiff Dorit Cohen is a citizen of Israel. She is a sister of decedent Kochava Shriki. Dorit Cohen brings this action individually and as a personal representative of the estate of her sister, Kochava Shriki.

54.     Plaintiff Avraham Oss is a citizen of Israel. He is the brother of decedent Kochava Shriki. Avraham Oss brings this action individually and as a personal representative of the estate of his sister, Kochava Shriki.

55.     Plaintiff Nurit Cohen is a citizen of Israel. She is a sister of decedent, Kochava Shriki. Nurit Cohen brings this action individually and as a personal representative of the estate of her sister, Kochava Shriki.

56.     Plaintiff Yael Morad is a citizen of Israel. She is a sister of decedent, Kochava Shriki. Yael Morad brings this action individually and as a personal representative of the estate of her sister, Kochava Shriki.

57.     Plaintiff Ruth "Ruti" Gamliel is a citizen of Israel. She is a sister of decedent, Kochava Shriki. Ruth Gamliel brings this action individually and as a personal representative of the estate of her sister, Kochava Shriki.

58.     Plaintiff Esther Tibi is a citizen of Israel. She is a sister of decedent, Kochava Shriki. Esther Tibi brings this action individually and as a personal representative of the estate of her sister, Kochava Shriki.

59.     The remaining Plaintiffs listed in the caption but not named in the foregoing paragraphs (the "Surviving Plaintiffs") are all citizens of Israel.

60.     The Surviving Plaintiffs were all injured in, and suffered severe physical, mental, emotional, financial and other harm as a direct result of, the Attack.

**2.   Defendants.**

61.     Defendant Georges Zard Abou Jaoude is the former Chairman and General Manager of LCB. He also served as the Chair of LCB's Anti-Money Laundering Committee. Abou Jaoude exploited his positions to direct LCB's active financing of Hezbollah's terrorist activities and money laundering. These activities ultimately resulted in multiple U.S. government investigations, the imposition of massive sanctions, and the collapse of LCB.

62.     Abou Jaoude exploited his interlocking board and management positions in LCB to direct extensive money laundering operations in support of Hezbollah and to conceal from U.S., Lebanese, and other law enforcement officers and regulators LCB's financing of Hezbollah and LCB's laundering of Hezbollah money.

63.     Abou Jaoude is currently acting as one of LCB's two liquidators, putting him in a position to conceal the full extent of his participation in Hezbollah financing and money laundering activities.

64.     Defendant Mohamad Hamdoun is the former Deputy General Manager of LCB and served on LCB's Executive Board. He served as the Vice Chair of LCB's Anti-Money Laundering

Committee. Along with Abou Jaoude and other LCB officers, Hamdoun established LCB policies and initiated, directed, authorized, and executed LCB's actions detailed in this Complaint.

65.     Hamdoun has held at least 20% of LCB's shares. Hamdoun authorized and carried out, personally and through subordinates who were LCB managers, officers, and employees, (including, but not limited to, Defendant, Safa), LCB's actions detailed in this Complaint.

66.     As discussed in the Amended Forfeiture Complaint, Hamdoun is the brother-in-law of Colonel Rida el-Moussaoui, owner of Rayan (Offshore) LLC, one of the Hezbollah-controlled entities with which LCB knowingly conducted business. Amended Forfeiture Complaint at 27-29, ¶47d.

67.     Hamdoun personally initiated and authorized LCB's banking relationship with Hezbollah, including the opening and maintenance of the Hezbollah Accounts, and the processing of the Hezbollah Wire Transfers.

68.     Hamdoun also operated through his direct subordinate, Defendant, Ahmad Safa, who was the Associate General Manager for Branches and Operations in LCB.

69.     Hamdoun exploited his interlocking board and management positions in LCB, to direct extensive money laundering operations in support of Hezbollah, and to conceal from U.S., Lebanese, and other law enforcement officers and regulators LCB's financing of Hezbollah and LCB's laundering of Hezbollah money.

70.     Hamdoun is currently acting as one of LCB's two liquidators, putting him in a position to conceal the full extent of his participation in Hezbollah financing and money laundering activities.

71.     Defendant Ahmad Safa is the former Assistant General Manager responsible for LCB's Branches and Operations. Among other things he oversaw all LCB branches. Safa reported

directly to Abou Jaoude and functioned as Hamdoun's operational enforcer at the Bank. Through his managerial and operational roles at LCB, and at the direction of Abou Jaoude and Hamdoun, Safa organized and directed LCB's actions detailed in this Complaint.

72. At a February 1, 2023 hearing in the Southern District of New York, counsel for Hamdoun and LCB confirmed Safa's role in financing Hezbollah terrorism, accurately asserting that Safa was "personally and knowingly involved in managing the so-called Hezbollah accounts." *Lelchook v. Hamdoun*, case no. 18-cv-12401 (S.D.N.Y.).

73. Safa opened the Hezbollah Accounts, and managed them on a day-to-day basis in collaboration with Hezbollah, and carried out the Hezbollah Wire Transfers, pursuant to the direction and authorization of Hamdoun. In fact, Hamdoun personally signed, and approved numerous Hezbollah Wire Transfers. *See e.g.,* Exhibit C, at 5, 14, 18, 21, 24, 29, 33, 39, 42, 45, 48, 51, 103, 117, 134, 141, 144 (with the exhibit cover the pagination of the PDF file if off by 1 from the pagination of the exhibits as filed in the *Joumaa* case file).

74. Safa's executive role does not diminish the respective roles of Abou Jaoude and Hamdoun, under whose directions Safa operated.

75. The 2011 Treasury Finding determined that LCB managers, including the Defendants, were complicit in the Hezbollah money laundering network. Treasury Finding at 7-8.

76. The Treasury Finding further alleges that Abou Jaoude, Hamdoun, and Safa were "in frequent – in come cases even daily – communication with various members of the [Hezbollah] drug trafficking and money laundering network, and they personally process transactions on the network's behalf." Amended Forfeiture Complaint at 12.

**C.  JURISDICTION AND VENUE.**

77. This Court has subject matter jurisdiction in this action under 28 U.S.C. § 1350.

78.     Venue is proper in this district pursuant to 28 U.S.C. § 1391 because the Defendants are aliens not resident in the United States, and because a substantial part of the actions and omissions giving rise to the claims herein complained of occurred in this district.

79.     This Court has personal jurisdiction over the Defendants because Plaintiffs' claims are based upon Defendants' purposeful acts to finance Hezbollah and launder Hezbollah's money through banks and used car buyers in the United States, including in the Southern District of Florida. For example, Defendants caused LCB to repeatedly effect more than $33 million in wire transfers through LCB's U.S. correspondent accounts for the purpose of facilitating the purchase and shipment of used cars in the State of Florida. More than $22 million of these Florida used car transactions took place within the Southern District of Florida. These money transfers and car purchases in Florida and elsewhere in the United States formed an essential part of Defendants' conduct giving rise to this action. These transfers to Florida used car dealers were purposefully and deliberately routed into Florida for the purpose of purchasing used cars in Florida and otherwise advancing the scheme described herein.

80.     The Defendants actively and personally engaged in intentional misconduct through which they executed their Hezbollah money laundering scheme in coordination with Florida entities and individuals, all for the purpose of financing Hezbollah's activities, including the Burgas Airport Attack.

81.     The Treasury Finding states that members of the Hezbollah money laundering network coordinated the transportation, distribution, and sale of multi-ton bulk shipments of cocaine from South America, and laundered the proceeds from the cocaine sales by depositing the currency into various LCB accounts. The operatives would then:

instruct LCB to perform wire transfers ... to LCB's U.S. correspondent accounts via suspiciously structured electronic wire transfers to multiple U.S.-based used car dealerships – some of which [were] operated by individuals who [were] separately identified in drug-related investigations. The recipients used the funds to purchase vehicles in the United States, which [were] then shipped to West Africa and/or other overseas destinations, with the proceeds ultimately repatriated to Lebanon.... Hizballah derived financial support from the criminal activities of [this] network. Treasury Finding at 9-10; *see also id*. at 12.

82.     According to the Amended Forfeiture Complaint (at p. 36, ¶ 50):

LCB transferred these funds knowing that the funds represented the proceeds of illegal activities; that the transfers were in furtherance of a scheme intended to conceal and disguise the true source, nature, ownership, and control of those proceeds; and to promote those illegal activities; and that this money laundering scheme benefitted Hizballah.

83.     The Treasury Department's Office of Foreign Asset Control ("OFAC") has also determined that Ayman Saied Joumaa ("Joumaa") (discussed below), a U.S. Department of Treasury-designated Drug Kingpin, laundered, ***in Florida***, the proceeds of the Hezbollah narcotics trafficking operation. *See Joumaa v. Mnuchin*, No. CV 17-2780 (TJK), 2019 WL 1559453 (D.D.C. Apr. 10, 2019), *aff'd*, 798 F. App'x 667 (D.C. Cir. 2020). OFAC informed Joumaa that it possessed evidence that Joumaa had "coordinated drug money laundering in Florida and that he laundered money through the export of vehicles from the United States to West Africa." *Id*.

84.     Joumaa's 2011 indictment filed in the Eastern District of Virginia alleged, among other things, that Joumaa had laundered hundreds of millions of dollars of proceeds from the sale of cocaine.

85.     Thus, the Hezbollah money laundering scheme was focused in Florida.

86.     The United States Treasury specifically found that Defendants Abou Jaoude and Hamdoun, and the managers of key LCB branches were "in frequent-in some cases even daily-communication" with the various members of the Hezbollah drug trafficking and money laundering network, and they personally processed transactions on the network's behalf. Treasury Findings at 12.

87.     The Treasury Finding also concluded that these Defendants **personally** processed transactions on the network's behalf. Treasury Findings at 12.

88.     Hezbollah's many relationships with the LCB managers contributed towards making LCB the favored bank of the Hezbollah exchange houses:

> In this criminal scheme, the proceeds have been laundered through various methods, including bulk cash smuggling operations and use of several Lebanese exchange houses that utilize accounts at LCB branches managed by family members of other participants in the global money laundering network.

89.     Thus, the Defendants conspired with Hezbollah, its affiliates and agents to cause LCB to transfer substantial amounts of illicit funds to used car buyers in Florida and other U.S. states for purposes of laundering proceeds of illicit Hezbollah transactions and providing financial support to Hezbollah.

90.     The Plaintiffs are foreign citizens, as they must be to bring a lawsuit under the ATCA. The very purpose of the ATCA is to provide a federal forum to adjudicate claims **by aliens**

to redress torts committed in violation of the law of nations or treaties of the United States, where, as here, such torts have a nexus to the United States. 28 U.S.C. § 1350.

91.     Defendants' torts here have a United States nexus. Specifically, as detailed herein, the Defendants personally exploited the United States financial and correspondent banking system and used car market to finance Hezbollah terrorism, genocide, and other crimes against humanity, including the Attack, and to launder Hezbollah funds.

92.     Under the scheme, between 2007 and 2011, 30 used car purchasers in Alabama, Connecticut, Florida, Georgia, Maryland, Massachusetts, Michigan, New Jersey, North Carolina, Ohio, Oklahoma, and Tennessee received over 3,500 wire transfers totaling nearly $250 million.

93.     Thus, Defendants' torts touch and concern the United States.

**D.  FACTUAL ALLEGATIONS.**

**1.  Hezbollah is a genocidal international terrorist organization.**

94.     Hezbollah is an international terrorist organization that was established in Lebanon approximately 1982. It has been designated as a terrorist organization under the U.S. Terrorism Sanctions Regulations, 60 Fed. Reg. 5079 (Jan. 23, 1997), the Foreign Terrorist Organizations Sanctions Regulations, 62 Fed. Reg. 52,650 (Oct. 8, 1997), the Global Terrorism Sanctions Regulations, 67 Fed. Reg. 12,633 (Mar. 19, 2002), and the Iran and Syria Nonproliferation Act, 72 Fed. Reg. 20,158 (Apr. 23, 2007).

95.     Hezbollah views the State of Israel, the United States, and other Western countries as its enemies. In addition to attacking United States targets in Lebanon, the Sudan, and elsewhere, Hezbollah has employed terrorist means to commit genocide and other crimes against humanity by targeting civilian targets, and, in particular, Israeli and Jewish civilian targets in Israel and throughout the world. The stated purpose of Hezbollah's ongoing terrorist activities against Israeli

and Jewish civilians is the ethnic cleansing of the territory of the State of Israel of all of its Jewish inhabitants. Moreover, Hezbollah has targeted non-Israeli Jewish targets, world-wide, with the genocidal purpose of murdering Jews. See e.g., "It's Time to Mobilize a Global Response to the Terrorist Group Lebanese Hizballah" (October 10, 2017), https://trumpwhitehouse.archives.gov/articles/time-mobilize-global-response-terrorist-group-lebanese-hizballah/.

96.     Hezbollah operatives claim that, in general, "Hizballah does not kill just to kill." However, violence against Jews and Israelis is different and they are "always a target" for Hezbollah.

97.     For example, Hossam Yaacoub, a Hezbollah operative arrested in Cyprus in July 2012 (the same month as the Burgas Airport Attack), was engaged in surveillance of Israeli civilian tourists at the Larnaca, Cyprus airport and elsewhere. Yaacoub revealed to police investigators: "It was just collecting information about the Jews, and that is what my organization is doing everywhere in the world." See "Breaking Hezbollah's 'Golden Rule': An Inside Look at the Modus Operandi of Hezbollah's Islamic Jihad Organization," Matthew Levitt, Perspectives on Terrorism, Vol. 14, Issue 4 at 23. A subsequent investigation revealed that between 2010 and 2015, Hezbollah had stored in Cyprus enormous amounts of ammonium nitrate, the explosive material used in the Burgas Airport Attack.

98.     Hezbollah has engaged in numerous other genocidal attacks against Jews, Israelis, and others.

99.     For example, on July 18, 1994, Hezbollah bombed the Jewish community center in Buenos Aires, Argentina, killing 85 people and injuring over 200.

100.    And, between July 12, 2006 and August 14, 2006 Hezbollah fired thousands of rockets and missiles aimed at civilian population centers in northern Israel, killing 43 civilians and injuring 1384 others. Hezbollah's indiscriminate missile fire forced approximately one million Israelis to remain near or in bomb shelters or security rooms, and compelled approximately 250,000 civilians to evacuate northern Israel and relocate to other areas of the country.

101.    In 2010, State Department officials described Hezbollah as the most technically capable terrorist group in the world and a continued security threat to the United States.

102.    At all times relevant hereto Hezbollah sought, as an official and publicly-stated policy and goal of Hezbollah, to destroy the State of Israel and "ethnically cleanse" the territory of the State of Israel of its Jewish population by murder and/or expulsion.

103.    Since its founding and until today, Hezbollah has sought to achieve its goal of destroying the State of Israel and murdering or expelling its Jewish residents through the use of terrorist attacks on Jewish civilians both in Israel and elsewhere, regardless of their nationality.

104.    Since its founding and until today, Hezbollah has carried out hundreds of terrorist attacks targeting Jewish civilians in Israel and elsewhere. These Hezbollah attacks have killed hundreds of innocent civilians and wounded thousands more.

105.    Since its founding and until today, Hezbollah has also carried out hundreds of terrorist attacks against American targets. These attacks have killed hundreds of U.S. citizens and wounded hundreds more.

106.    Between 1982 and until the present day, Hezbollah's policy and practice of carrying out terrorist attacks against Jewish civilians in Israel and elsewhere, and against United States targets, was notorious and well known to Defendants and to the public at large.

107.     Hezbollah has consistently openly, publicly, and repeatedly acknowledged having a policy and carrying out terrorist attacks against Jewish civilians in Israel and elsewhere, and against United States targets. Hezbollah made these acknowledgments on its official websites, in its official press releases, on its official television station, Al-Manar, on its official radio station, Al-Nour, and in numerous press conferences and news media interviews and public speeches conducted by senior Hezbollah officials.

108.     Hizballah's practice and policy of carrying out terrorist attacks and activities targeting Jewish civilians in Israel and elsewhere, and United States civilians and others has also been publicly expressed through the commission of countless brutal terrorist attacks, including, but not limited to:

- The July 19, 1982, kidnapping of American University president David S. Dodge in Beirut.

- The April 18, 1983, car bomb attack on the United States Embassy in Beirut in which 63 people were killed.

- The October 23, 1983, truck bomb attack on the U.S. Marine barracks in Beirut in which 241 Americans were killed.

- The September 20, 1984, car bomb attack on the U.S. Embassy annex in Beirut in which two Americans and 22 others, mostly civilians, were killed.

- The March 16, 1984, kidnapping and murder of William Buckley, a CIA operative working at the U.S. Embassy in Beirut.

- The April 12, 1984, attack on a restaurant near the U.S. Air Force Base in Torrejon, Spain in which eighteen U.S. servicemembers were killed and 83 people injured.

- The December 4, 1984, terrorist hijacking of a Kuwait Airlines plane in which four passengers were murdered, including two Americans.

- The June 14, 1985, hijacking of TWA Flight 847 in which one American was murdered and others held hostage before being released on June 30, 1985.

- The March 17, 1992, bombing of the Israeli Embassy in Buenos Aires that killed 29 people and injured over 200.

- The July 18, 1994, bombing of the Jewish community center in Buenos Aires that killed 86 people and injured over 200.

- The November 28, 1995, bombardment of towns in northern Israel with missiles aimed at Jewish civilians.

- The March 30, 1996, bombardment of northern Israeli towns with 28 missiles. A week later, Hezbollah fired 16 additional missiles, injuring 36 Israelis.

- The August 19, 1997, bombardment of northern Israel with dozens of missiles aimed at Jewish civilians.

- The December 28, 1998, bombardment on northern Israel with dozens of missiles aimed at Jewish civilians.

- The May 17, 1999 bombardment on northern Israel with dozens of missiles aimed at Jewish civilians.

- The June 24, 1999, bombardment on northern Israel, killing 2 people.

- The April 9, 2002, launching of missiles into northern Israeli towns.

- The August 10, 2003, firing of shells that killed a 16-year-old Israeli boy and wounded other Israeli civilians.

- The February 2005 assassination of former Lebanese Prime Minister Rafik Hariri in which Hariri and 21 others were killed by the Hezbollah roadside bomb planted in Beirut.

- The 2006 bombardment of Israeli cities and towns with thousands of rockets and missiles over a 34-days period.

- Since 2011, Hezbollah has operated in Syria, carrying out attacks against rebel forces and civilians during the course of the Syrian civil war. During this time, Hezbollah has served as a mercenary force for both Syrian President Bashar al-Assad and Iran's Islamic Revolutionary Guard Corps. Hezbollah has repeatedly engaged in terror attacks on civilians and has conducted summary executions of civilians.

- In July 2012, the same month as the Burgas Airport Attack, a Hezbollah agent was arrested in Larnaca, Cyprus and confessed to planning Hezbollah attacks in Cyprus against Israeli civilian airplanes and tour busses.

- Since the 2012 Burgas Airport Attack law enforcement and intelligence authorities have successfully thwarted a long list of Hezbollah plots and operational preparations around the world, including cases in Bolivia, Canada, Cyprus, Nigeria, Peru, Thailand, the United Kingdom, and the United States. See Levitt, "Breaking Hezbollah's 'Golden Rule'" at 1 and notes 3-6.

- "In 2015, authorities in the United Kingdom arrested a Hizballah operative, a dual British-Lebanese citizen, who had amassed 12,500 first aid cold packs in a London auto garage. The cold packs contained over three metric tons of ammonium nitrate." Remarks of Ambassador Nathan Sales, U.S. coordinator for counterterrorism at the

Department of State, at AJC Hizballah/Europe Event, September 17, 2020. See https://2017-2021.state.gov/remarks-at-ajc-hizballah-europe-event/index.html.

- Between 2012 and 2020, at least, Hezbollah maintained and trafficked additional large caches of ammonium nitrate in and through Belgium, France, Greece, Italy, Spain, and Switzerland. *Id*. Ambassador Sales stated unequivocally, that Hizballah stockpiled and put in place the caches of ammonium nitrate "so it could conduct major terrorist attacks whenever it – or its masters in Tehran – deemed necessary." *Id*.

109.    Additionally, Hezbollah's policy and practice of carrying out terrorist attacks was notorious and well known to Defendants and to the public at large because between 1998 and the present day, the courts of the United States published numerous decisions finding that Hezbollah was responsible for carrying out the attacks and other terrorist activities listed above and others.

110.    Hezbollah's domination and control over the Lebanese government are well-documented. For example, Newsweek magazine reported in 2018 that "Hezbollah is seizing the [Lebanese] state's institutions one by one ... Slowly but surely, [Hezbollah] is clearing its own path towards full control of Lebanon's government." According to Faysal Itani, a senior fellow and counter-terrorism expert at the Atlantic Council in Washington, D.C., "I do not see [Hizballah] as separate from the Lebanese government." Lebanon's justice minister resigned in 2016, citing what he called Hezbollah's "domination" of the country's government. According to a White House national security official, "[f]or decades, this terrorist organization [Hizballah] has tried to disguise its murderous intentions under the guise of political legitimacy." *See* "It's time to Mobilize a Global Response to the Terrorist Group Lebanese Hizballah," (Oct. 10, 2017), available at https://www.whitehouse.gov/articles/time-mobilize-global-response-terrorist-group-  lebanese-hizballah. The White House national security official further noted that "[t]oday, Hizballah and its

political allies hold half of the seats in Lebanon's Cabinet and nearly half of the seats in its National Assembly, while concluding that "[t]he same Hizballah officials responsible for its political apparatus oversee its terrorist planning." *Id.*; *accord* Tony Badran, *Lebanon Is Another Name for Hezbollah*, Found. Def. Democracy (July 26, 2017), http://www.defenddemocracy.org/media-hit/lebanon-is- another-name-for-hezbollah ("Hezbollah, of course, controls the Lebanese government. … The Lebanese state, in other words, is worse than a joke. It' s a front….").

111.    A Congressional Research Service Report accurately explained, "Lebanon's Hezballah ('Party of God') is a Shiite Islamist militia, political party, social welfare organization, and U.S. State Department-designated terrorist organization … Hezbollah has a unified leadership structure that oversees the organization's complementary, partially compartmentalized elements."

112.    Hezbollah is, and at all relevant times was, a complex, composite organization, which is composed of various subordinate entities that were created, and are entirely controlled, by Hezbollah.

113.    Hezbollah created, controls, and operates these subordinate entities to carry out specific tasks or categories of tasks. These subordinate entities are integral, constituent parts of Hezbollah itself, and to the extent that these entities have any putative separate legal personality or corporate form, such personality or form is a sham aimed at assisting Hezbollah to conduct its criminal, terrorist and genocidal activities using different names and aliases. Moreover, any separate legal personality or corporate form putatively enjoyed by these entities does not detract from the fact that they are inseparable and integral parts of the composite organization known as Hezbollah.

**2. Hezbollah exercises such extensive governmental control in Lebanon, both as an independent governing entity and through its control over the Lebanese government, that it may be deemed a state actor the actions of which are carried out under actual or apparent authority, or color of law.**

114.    For decades, Hezbollah has functioned as a "state within a state" in Lebanon, controlling and governing large areas of the country (including some of the borders), and fielding military forces far more powerful than Lebanon's own army. See e.g., Hezbollah: A State Within a State, Hussain Abdul Hussain, Hudson Institute, May 21, 2009, available at https://www.hudson.org/national-security-defense/hezbollah-a-state-within-a-state, last visited April 3, 2023.

115.    Additionally, Hezbollah's domination and control over the Lebanese government are well-documented. For example, Newsweek magazine reported in 2018 that "Hezbollah is seizing the [Lebanese] state's institutions one by one ... Slowly but surely, [Hezbollah] is clearing its own path towards full control of Lebanon's government." According to Faysal Itani, a senior fellow and counter-terrorism expert at the Atlantic Council in Washington, D.C., "I do not see [Hezbollah] as separate from the Lebanese government." Lebanon's justice minister resigned in 2016, citing what he called Hezbollah 's "domination" of the country's government. According to a White House national security official, "[f]or decades, this terrorist organization [Hezbollah] has tried to disguise its murderous intentions under the guise of political legitimacy." See "It's time to Mobilize a Global Response to the Terrorist Group Lebanese Hizballah," (Oct. 10, 2017), available at   https://www.whitehouse.gov/articles/time-mobilize-global-response-terrorist-group-lebanese-hizballah. The White House national security official further noted that "[t]oday, Hizballah and its political allies hold half of the seats in Lebanon's Cabinet and nearly half of the seats in its National Assembly," while concluding that "[t]he same Hizballah officials responsible for its political apparatus oversee its terrorist planning." *Id*.; *accord* Tony Badran, Lebanon Is Another Name for Hezbollah, Found. Def. Democracy (July 26, 2017), http://www.defenddemocracy.org/media-

hit/lebanon-is- another-name-for-hezbollah ("Hezbollah, of course, controls the Lebanese government. … The Lebanese state, in other words, is worse than a joke. It' s a front….").

116.     While Hezbollah is not a recognized foreign state, it exercises such extensive governmental control in Lebanon, both as an independent governing entity and through its control over the Lebanese government, that Hezbollah's acts described herein constitute actions carried out "under actual or apparent authority, or color of law."

117.     In addition to exercising control over the government of Lebanon, Hezbollah has characteristics of an independent state. It dominates a defined geographical area: "Hezbollah controls much of Lebanon's Shiite-majority areas, including parts of Beirut, southern Lebanon, and the eastern Bekaa Valley region." https://www.cfr.org/backgrounder/what-hezbollah. As Dr. Vincent Durac, associate professor, School of Politics and International Relations, University College Dublin, has correctly stated, "Hezbollah governs the areas in which it is present in Lebanon as if they were sovereign entities independent from the Lebanese state." See https://www.irishtimes.com/opinion/2022/12/24/hezbollah-angered-by-changes-to-unifil-mandate/. This was the case for many years prior to the 2012 Burgas attack.

118.     Additionally, "Hezbollah is a militia trained like an army and equipped like a state." http://www.nytimes.com/2006/08/07/world/middleeast/07hezbollah.html.

119.     "The religious, welfare, health, and education societies established by Hezbollah over the years have led the Shiite community to be dependent on Hezbollah. The failure of the Lebanese central government establishment to care for the Shiite community enabled Hezbollah's access to this governmental vacuum." https://israel-alma.org/2022/04/27/the-political-power-of-the-shiite-opposition-can-hezbollah-be-weakened-through-a-political-process/.

120.     Thus, Hezbollah is a state actor both because it exercises de facto control over the recognized Lebanese government and because it operates as an independent sovereign in areas of Lebanon where it is dominant.

**3.  Hezbollah depends upon money laundering and other illicit financial activities to facilitate its terrorist and genocidal activities.**

121.     As the result of its designation as a Specially Designated Terrorist ("SDT"), Foreign Terrorist Organization ("FTO"), and Specially Designated Global Terrorist ("SDGT"), efforts to support and finance Hezbollah violate the International Emergency Economic Powers Act of 1977 ("IEEPA"), codified at Title 50, United States Code, Sections 1701-1705. These provisions and the regulations, executive orders, adopted in connection therewith are collectively referred to herein as the "U.S. Sanctions Regime."

122.     The U.S. Sanctions Regime is intended to prevent Hezbollah from conducting banking activities, including wire transfers, and thereby limit its ability to carry out terrorist attacks.

123.     Hezbollah requires banking services, including the ability to carry out wire transfers, in order to: (a) build and maintain its operational infrastructure for the planning and execution of terrorist attacks; (b) purchase and store weapons, explosives and other materiel used by it to carry out its terrorist and genocidal activities; (c) pay, train, transport and shelter its terrorist operatives; and (d) carry out specific terrorist attacks.

124.     The U.S. Sanctions Regime is effective when it is observed and enforced.

125.     Hezbollah is unable to execute wire transfers and conduct other banking activities *via* banks and other financial institutions which observe and enforce the U.S. Sanctions Regime.

126.     If all banks and financial institutions worldwide observed and enforced the U.S. Sanctions Regime, the ability of Hezbollah to conduct banking activities would be severely restricted, and Hezbollah's ability to plan, to prepare and to carry out terrorist attacks would be significantly reduced.

127.     Nearly all banks and financial institutions around the world observe and enforce the U.S. Sanctions Regime.

128.     Because the U.S. Sanctions Regime is so effective, Hezbollah is forced to take steps to evade enforcement of the U.S. Sanctions Regime and to conduct its banking activities using those very few banks and financial institutions that do not observe and enforce the U.S. Sanctions Regime.

### 4. Defendants Intentionally Cause LCB to Provide Financial Services, Including Illicit Money Laundering, to Hezbollah.

129.     At least since 2008 several victims of Hezbollah terrorist acts have sued LCB for its role in financing Hezbollah terrorism. *See e.g., Kaplan v. Lebanese Canadian Bank, SAL*, case no. 1:08-cv-7253 (S.D.N.Y.). Defendants Abou Jaoude and Hamdoun were and have at all relevant times familiar with these lawsuits and the factual allegations regarding LCB's participation in Hezbollah's terrorist enterprises.

130.     In 2011 the United States Government initiated at least two significant enforcement proceedings directed at LCB's money laundering activities on behalf of Hizballah. One was a Notice of Finding issued by the Treasury Department's Financial Crimes Enforcement Network (FinCEN"), in which FinCEN found that LCB was a "Financial Institution of Primary Money Laundering Concern." See Exhibit A. The other was a civil forfeiture action directed at LCB and other entities that were engaged in the Hezbollah money laundering scheme discussed herein. See Amended Forfeiture Complaint, Exhibit B.

131.    Both Enforcement Actions were based, in large part, upon

a trade-based money laundering scheme involving the purchase of used cars and other

vehicles in the United States for shipment and sale abroad, with funds provided by banks,

currency exchanges, and individuals associated with, funded by controlled by, or directed

by the Lebanon-based terrorist organization known as Hizballah.

Amended Forfeiture Complaint at 16.

132.    The Amended Forfeiture Complaint adds:

... [T]he key participants and facilitators of the money laundering scheme include Hizballah

members and supporters, the Lebanese Canadian Bank, the Hassan Ayash Exchange Company,

Ellissa Holding and its subsidiaries and affiliates, Ayman Saied Joumaa, the Salhab group of

companies, and their principals, members of the Salhab family, used car lots in West Africa,

money couriers operating in West Africa and the Middle East, and used car buyers in the

United States.

*Id*. at 17-18.

133.    The Amended Forfeiture Complaint further states that the key participants,

including LCB provided funds, goods, and services to or for the benefit of Hezbollah and conspired

to violate and to evade and avoid the prohibitions of the U.S. Sanctions Regime by causing funds

to be wired from Lebanon to the United States for the purchase of used cars to be shipped by U.S.

persons to West Africa to create a channel for laundering proceeds of narcotics trafficking and

other illegal activities for Hizballah's benefit. *Id*. at 18.

134.    LCB and Defendants were aware of the U.S. Sanctions Regime and of the illegality

of money laundering. Indeed, Defendants Abou Jaoude and Hamdoun, served, respectively, as the

Chair and Vice Chair of LCB's Anti-Money Laundering Committee. Moreover, LCB had published an Anti-Money Laundering Policy Statement.

135.    Nonetheless, *at no time* did LCB observe or enforce the U.S. Sanctions Regime, and instead, under the control and direction of the Defendants, provided extensive illegal financial services to Hezbollah. The Amended Forfeiture Complaint states:

> Prior to being identified as an entity of primary money laundering concern by FinCEN ... LCB had poor anti-money laundering controls and, indeed, ***knowingly conducted business with Hizballah-controlled entities*** and individuals and entities linked to, among other things, African diamond smuggling, money laundering, and narcotics trafficking.

Amended Forfeiture Complaint at 27-28 (emphasis added).[4]

136.    One of Hezbollah's most important subordinate entities, which was created by and is and at all times was wholly controlled by Hezbollah, is the Shahid (Martyrs) Foundation (a/k/a Shahid (Martyrs) Organization) ("Shahid").[5]

137.    Shahid is part of Hezbollah's Social Service Section, which a senior U.S. military analyst has correctly characterized as the "most important branch of the Hezbollah organization… The Social Service Section serves as an equal arm within the organization and is used as much as the military and political wing in terms of leverage."[6] Shahid's purpose is to provide financial and other material support to Hezbollah terrorists wounded in action, and to the families of Hezbollah terrorists killed in action. The purpose of that funding and support is to "provide peace of mind to

---

[4] Many of these diamond smugglers were also associated with Hezbollah. See e.g., Verified Amended Civil Forfeiture Complaint at 30-31.

[5] The name "Shahid," is Arabic for "martyr."

[6] Major James B. Love, **Hezbollah: Social Services as a Source of Power**, U.S. Joint Special Operations University (2010), at 21.

current and prospective" Hezbollah terrorists, "by knowing that they and their families will be cared for in the event of death or injury."[7]

138.    Two other critical Hezbollah-created and wholly-controlled subordinate entities within Hezbollah are Bayt al-Mal and the Yousser Company for Finance and Investment ("Yousser"). In a statement issued on September 7, 2006, the U.S. Treasury correctly explained that:

> Bayt al-Mal is a Hizballah-controlled organization that performs financial services for the terrorist organization. Bayt al-Mal operates under the direct supervision of Hizballah Secretary General Hasan Nasrallah. As Hizballah's main financial body, Bayt al-Mal serves as a bank, creditor, and investment arm for Hizballah. … Bayt al-Mal utilizes the Yousser Company for Finance and Investment to secure loans and finance business deals for Hezbollah companies.

139.    Despite the U.S. Sanctions Regime, LCB maintained banking relationships with both Bayt al-Mal and the Yousser Company. In 2006 the Treasury Department's Office of Foreign Asset Control ("OFAC") designated both Bayt al-Mal and the Yousser Company as Specially Designated Global Terrorists. Stuart Levey, who was then the U.S. Treasury's Under Secretary for Terrorism and Financial Intelligence, explained, "Bayt al-Mal and the Yousser Company function as Hezbollah's unofficial treasury, holding and investing its assets and serving as intermediaries between the terrorist group and mainstream banks."

140.    Between 2004 (or earlier) and until July 12, 2006 (and later), Hezbollah continuously maintained bank accounts at various LCB branches in Lebanon titled to Shahid, including the following dollar accounts:

---

[7] *Id*. at 24.

- 207-108987
- 207-108987-2-521-0
- 207-108987-2-521-1
- 207-108987-2-521-9
- 207-108987-2-571-0

141.   As early as 2004 or earlier, LCB also opened and continuously maintained accounts for Hezbollah's Bayt al-Mal. These accounts, which were nominally listed in the names of Bayt al-Mal and Hezbollah leaders, Husayn al-Shami (a/k/a Hussein Ali Mohamed Chami) and Wahid Mahmoud Sbeity (but were in fact Hezbollah accounts), included the following:

- 213-130010-2-571-0 (dollars)
- 213-130010-1-571-0 (Lebanese Lira)

142.   During the same period (2004 or earlier through 2006 or later), LCB also opened and continuously maintained accounts for Yousser (which, as noted, operated together with Bayt al-Mal as Hezbollah's treasury and investment arm). These accounts, too, belonged to Hezbollah and were under the control of Hezbollah, and included the following:

**LCB Airport Branch**

- 70187 (Yousser central account)
- 207-70187-2-521-0 (dollars)
- 207-70187-69-521-0 (euro)
- 207-70187-2-401-0 (dollars)

**LCB Tyre Branch**

- 214-142610-2-571 (dollars)

33

143.    The Shahid, Bayt al-Mal and Yousser accounts described above are collectively referred to hereinafter as "Hezbollah Accounts."

144.    All of the Hezbollah Accounts belonged to Hezbollah and were under the control of Hezbollah, all of the funds held in the Hezbollah Accounts belonged to Hezbollah and were under the control of Hezbollah and all the transactions carried out in the Hezbollah Accounts were carried out by Hezbollah and at the direction of Hezbollah.

145.    Beginning in 2004, LCB began to provide extensive wire transfer services to Hezbollah via its correspondent bank in the United States.

146.    Beginning in 2004 and continuing at least until 2006, Hezbollah made and received many scores of dollar wire transfers via LCB totaling many millions of dollars (hereinafter: "Hezbollah Wire Transfers"). All the Hezbollah Wire Transfers were made to, from and/or between the Hezbollah Accounts, via LCB's correspondent bank in the United States.

147.    Defendants Abou Jaoude, Hamdoun, and Safa initiated and authorized LCB's banking relationship with Hezbollah, including the opening and maintenance of the Hezbollah Accounts, and the processing of the Hezbollah Wire Transfers.

148.    Shahid, Bayt al-Mal and the Yousser Company remained subject to their terrorist designations until and beyond the date of the Attack.

149.    Hassan Ayash Exchange and Ellissa Exchange were two Lebanese money exchange companies. They were both designated Hezbollah entities that facilitated the elaborate money laundering scheme perpetrated by the Defendants to finance Hezbollah terrorist attacks including the Burgas Airport Attack.

150.    Hassan Ayash Exchange and Ellissa Exchange coordinated wire transfers through LCB to the United States to launder Hezbollah narcotics proceeds for use in Hezbollah terrorist attacks including the Burgas Airport Attack.

151.    The Hassan Ayash Exchange was owned and controlled by Mahmoud Hassan Ayash, a Hezbollah operative who enjoyed family ties to the leader of Hezbollah, Secretary General Hassan Nasrallah.

152.    As discussed in the Amended Forfeiture Complaint, LCB maintained banking relationships with numerous other entities and individuals who were controlled by or closely associated with Hezbollah. Many of these entities and individuals were designated as terrorists under various U.S. government statutes and/or regulations and were subject to the U.S. Sanctions Regime.

153.    In response to a 2002 UN report about a Hezbollah -linked money-laundering gang with which LCB had a banking relationship, LCB dismissed the report's findings and declared that "*we consider such allegation as part of the propaganda and war launched by the Jewish state against Lebanon*." LCB not only refused to end the relationship with the Hezbollah money-laundering gang, but instead authorized an *increase* in the gang's credit limits.

154.    Ayman Saied Joumaa ("Joumaa"), was a U.S. Department of Treasury-designated Drug Kingpin under the Foreign Narcotics Kingpin Designation Act, 21 U.S.C. §§ 1901-1908. Joumaa controlled and directed an international network of traffickers and launderers that transported, distributed, and sold multi-ton shipments of South American cocaine to West Africa. Joumaa operated his network in substantial part for the benefit of Hezbollah. According to the Under Secretary for Terrorism and Financial Intelligence, the Joumaa network was a sophisticated

multi-national money laundering ring, which launders the proceeds of drug trafficking for the benefit of the terrorist group Hezbollah.

155.    On January 26, 2011, when OFAC designated Joumaa, it also designated 9 other individuals and 19 entities that were connected to Joumaa as Specially Designated Narcotics Traffickers. The Hassan Ayash Exchange and Ellissa Exchange were among the entities designated along with Joumaa. New Line Exchange Trust Co. ("New Line"), a third Lebanese exchange was also designated at that time[8].

156.    In *Joumaa v. Mnuchin*, No. CV 17-2780 (TJK), 2019 WL 1559453 (D.D.C. Apr. 10, 2019) (*supra*), Joumaa sued the Secretary of the Treasury and OFAC to challenge their denial of his petition to rescind his designation. The district court upheld the government's decision and the D.C. Circuit affirmed. 798 F. App'x 667 (D.C. Cir. 2020). The record there includes numerous New Line requests to effect U.S. dollar denominated transfers out of LCB. The amounts of these transfer requests were mostly in the tens and hundreds of thousands of dollars. Some of these transfer requests represented cash transactions, and some were made for the benefit of entities in Miami, Florida. *See e.g*., Exhibit C.

157.    Defendant Hamdoun *personally* signed and approved numerous such transfer requests on behalf of LCB. *See e.g.,* Exhibit C, at 5, 14, 18, 21, 24, 29, 33, 39, 42, 45, 48, 51, 103, 117, 134, 141, 144 (with the exhibit cover the pagination of the PDF file if off by 1 from the pagination of the exhibits as filed in the *Joumaa* case file).

---

[8] See Department of the Treasury Press Release, Treasury Targets Major Lebanese-Based Drug Trafficking and Money Laundering Network, https://home.treasury.gov/news/press-releases/tg1035. Last visited April 3, 2023.

158.    In 2011, Joumaa was indicted in the Eastern District of Virginia for distributing cocaine and conspiracy to commit money laundering for Hezbollah. See *United States v. Joumaa*, Case No. 1:11-CR-560, ECF 1 (E.D. Va.).

159.    Joumaa and his organization played a dual role in the drug trafficking operation. ***First***, Joumaa coordinated the shipment of tens of thousands of kilograms of cocaine from Colombia through Central America and Mexico to the United States. ***Second***, beginning around 1997 through at least 2010, Joumaa helped coordinate the laundering of hundreds of millions of dollars in proceeds from drug sales in the United States, Europe, Mexico, and Central America.

160.    Oussama Salhab was a Hezbollah operative who ran an international network of money couriers centered in West Africa. As alleged in the Amended Forfeiture Complaint, on or about November 22, 2009, Salhab flew into the Detroit Metropolitan Airport on a flight from Beirut, Lebanon. During an interview with a U.S. Customs and Border Protection ("CBP") officer, Salhab stated that he was traveling to the United States for business on behalf of Cybamar Swiss Gmbh, LLC. He had on his person a business card identifying Salhab as the President of STE Marco SARL. During a border inspection of a fingerprint-encrypted laptop Salhab carried with him, CBP officers found, among other things, images of Hezbollah Secretary General Hassan Nasrallah; audio of the Hezbollah anthem; images of Hezbollah militants stomping on an Israeli flag; and movie files of executions, hangings, torture, and beheadings. Salhab claimed that the images were placed on his computer by an employee. Salhab was allowed to withdraw his application for admission into the United States and to depart the country.

161.    Oussama Salhab was heavily involved in the used car business in Benin and Togo and controlled a network of money couriers who transported millions of dollars in cash from West

Africa to Lebanon, and who travelled to the United States to transport cash and to purchase used cars for shipment to West Africa.

162.    According to the Treasury Department Finding and the Amended Forfeiture Complaint, Salhab's couriers transported currency in bulk through West Africa to Lebanon, as well as into the United States. The money transported by Salhab's couriers included the proceeds of illegal drug sales in Europe, destined for laundering by Joumaa's organization.

163.    Around the mid-2000s, much of Joumaa's drug trafficking operation and Salhab's money courier network in Africa was centered in Benin, Togo, and the Democratic Republic of the Congo. Upon information and belief, Joumaa and Salhab were interested in expanding their operations into Northern Africa because of its proximity to Europe and especially Spain, where many of the proceeds of illegal narcotics sales were generated.

164.    Abou Jaoude and Hamdoun had established secretive banking operations in Gambia, Congo, and Algeria that they used to advance their Hezbollah money laundering scheme.

165.    Additionally, LCB had a controlling financial interest in a number of subsidiaries, including LCB Investments (Holding) SAL, LCB Finance SAL, LCB Estates SAL, LCB Insurance Brokerage House SAL, Dubai-based Tabadul for Shares and Bonds LLC, and Prime Bank Limited of Gambia. LCB owned 51 percent of Prime Bank, with remaining shares held by local and Lebanese partners, at least one of whom was a known supporter of Hezbollah. LCB served as the sole correspondent bank for Prime Bank. In addition to Gambian nationals, Prime Bank served Iranian and Lebanese clientele throughout West Africa. References herein to LCB include its subsidiaries.

166.    Defendants Abou Jaoude and Hamdoun conceived of a plan to exploit their control over LCB to enable Joumaa, Salhab, and others to launder drug proceeds for purposes of financing Hezbollah's terrorist attacks on civilians and other acts of terrorism and crimes against humanity.

167.    As part of the money laundering scheme, Abou Jaoude, Hamdoun, and Safa continuously and repeatedly used LCB to wire substantial amounts of U.S. currency to used car buyers throughout the United States.

168.    These wire transfers passed through correspondent banks in New York. To conduct these transfers, LCB maintained correspondent banking relationships with the Bank of New York Mellon, Standard Chartered Bank, Wells Fargo Bank, JPMorgan Chase Bank, and Mashreq Bank in New York. Defendants caused LCB to utilize these correspondent relationships to further the scheme.

169.    According to the Treasury Department, exchanges and companies related to Joumaa originated over $66 million in wire transfers from Lebanese Banks between 2006 and 2011. Approximately, 94% of those funds originated from LCB. Thus, the Treasury Department concluded that LCB was the Joumaa network's favored bank for illicit banking activity.

170.    Mahmoud Hassan Ayash and the Hassan Ayash Exchange facilitated bulk cash transfers and money laundering for Joumaa and other Hezbollah narco-terrorists.

171.    Among other things, Hassan Ayash helped connect and facilitate the money laundering scheme between Joumaa and LCB managers, Defendants Abou Jaoude, Hamdoun, and Safa. Specifically, Hassan Ayash and the Defendants herein coordinated wire transfers through LCB to the United States for the purpose of laundering drug proceeds by purchasing used cars in the United States and shipping them to West Africa.

172.     According to the United States government, Defendants, Abou Jaoude, Hamdoun, and Safa used the Hassan Ayash Exchange to originate these wire transfers to help disguise and conceal the source, nature, ownership, and control of the proceeds of Joumaa's and others' narcotics trafficking.

173.     Similarly, the Ellissa Exchange facilitated bulk cash transfers and laundered money for Joumaa's Hezbollah network and for other Hezbollah narcotics traffickers.

174.     Defendants Abou Jaoude, Hamdoun, and Safa used the Ellissa Exchange to originate wire transfers to the United States to fund the purchase of used cars. Defendants used these wire transfers to help disguise and conceal the source, nature, ownership, and control of the proceeds of Joumaa's and others' narcotics trafficking.

175.     The Ellissa Exchange was owned and controlled by Ellissa Holding Company, which owned and controlled multiple companies based in Lebanon, Benin, and the Democratic Republic of the Congo.

176.     Among the Ellissa Holding Company's subsidiaries were: (a) the Ellissa Group, S.A., which owned a car park in Benin used for receiving used cars shipped from the United States; and (b) Ellissa Shipping, which was used to transport some of the cars involved in the money laundering scheme.

177.     The Hassan Ayash Exchange, the Ellissa Exchange, and their principals held accounts with LCB.

178.     In approximately 2006, at Defendant, Safa's direction, the Hassan Ayash Exchange became LCB's primary source of foreign currencies, in particular, U.S. dollars. Prior to Safa's intervention, LCB had maintained a diversified source of foreign currencies.

179.    In 2006, an LCB due diligence report noted that the Ellissa Exchange and its principals had been implicated in smuggling cash out of Africa through several channels. The due diligence report noted that LCB had limited "know your customer" ("KYC") files for these clients and that another Lebanese bank closed the accounts of the Ellissa Exchange. The due diligence report also described large cash deposits into accounts of the exchange's owners, transactions inconsistent with the nature and purpose of the accounts, and the exchange's failures to supply information about the nature and purpose of transactions.

180.    Between 2007 and 2011, Defendants herein caused LCB to transfer approximately $230,000,000 from various LCB accounts to used car buyers in the United States (including Florida) for the purpose of buying and shipping used cars.

181.    Defendants knew that these funds represented the proceeds of illegal activities; that the transfers were in furtherance of a scheme intended to conceal and disguise the true source, nature, ownership, and control of those proceeds; that the transfers were intended to promote further illegal activities; and that this money laundering scheme benefitted Hezbollah and advanced its genocidal terrorist activities.

182.    According to the Amended Forfeiture Complaint, Joumaa and the individuals and entities associated with his organization originated approximately $62 million in wire transfers through LCB between 2006 and 2011. Mahmoud Hassan Ayash, a Hezbollah operative who facilitates bulk cash transfers and money laundering for Joumaa and other narco-terrorists, and the individuals and entities associated with his organization originated at least $32 million in wire transfers through LCB between 2006 and 2011. Salhab and the individuals and entities associated with his organization originated at least $7.5 million in wire transfers through LCB between 2006 and 2011.

183.     Defendants knew that these funds represented the proceeds of illegal activities; that the transfers were in furtherance of a scheme intended to conceal and disguise the true source, nature, ownership, and control of those proceeds; that the transfers were intended to promote further illegal activities; and that this money laundering scheme benefitted Hezbollah and advanced its genocidal terrorist activities.

184.     As described in greater detail in the Amended Forfeiture Complaint, the wire transfers typically were for tens of thousands of dollars each, with some U.S. car buyers receiving a handful of wire transfers between 2007 and 2011, and others receiving hundreds of transfers. For example, during that time period, Car UZD and MID Overseas Inc. in Miami, Florida, received 258 wire transfers totaling more than $22 million. MGM Global Trading, LLC in South Windsor, Connecticut received 353 wire transfers totaling almost $33.5 million. And World Auto Sales, LLC in Birmingham, Alabama received 490 wire transfers totaling over $24 million. Together, between 2007 and 2011, 30 used car purchasers in Alabama, Connecticut, Florida, Georgia, Maryland, Massachusetts, Michigan, New Jersey, North Carolina, Ohio, Oklahoma, and Tennessee received over 3,500 wire transfers totaling more than $230 million.

185.     Among the used car purchasers that received wire transfers was United Auto Enterprize, Inc., which, according to corporate records maintained by the Michigan Department of Licensing and Regulatory Affairs was registered on March 21, 2007 by Rola Salhab. Upon information and belief, Rola Salhab is related to Oussama Salhab.

186.     On February 2, 2007, Fadi Salhab, who is a member of Oussama Salhab's family, registered an entity called Cybamar Swiss Gmbh, LLC with the Michigan Department of Licensing and Regulatory Affairs. On January 28, 2008, another member of the Salhab family, Dina Salhab, registered another affiliated company, Cybamar USA, LLC, with the Michigan Department of

Licensing and Regulatory Affairs. Cybamar Swiss and Cybamar USA share the same registered address in Redford, Michigan.

187.    Cybamar Swiss was a shipping company that was frequently used to transport the used cars to West Africa.

188.    According to the Treasury Finding and the Amended Forfeiture Complaint, the car buyers in the United States would use the money wired through LCB and correspondent banks in the United States to purchase used cars.

189.    The United States used car buyers received wire transfers, often from the Hassan Ayash Exchange and the Ellissa Exchange, sent through LCB. The United States used car buyers also received wire transfers for the purpose of buying and shipping used cars from other LCB account holders. Several of these other LCB account holders are identified in the Amended Forfeiture Complaint at pp. 49-52.

190.    Typically, the amount of each wire transfer was tens of thousands of dollars, and some of the used car purchasers in the United States received hundreds of such transfers. Between 2007 and 2011, LCB made over 3,500 such wire transfers to 30 car purchasers in twelve states -- Alabama, Connecticut, Florida, Georgia, Maryland, Massachusetts, Michigan, New Jersey, North Carolina, Ohio, Oklahoma, and Tennessee – totaling more than $230 million. After receiving wire transfers, the car purchasers bought used cars in the states where they operated and shipped them to West Africa.

191.    The United States used car buyers typically did not have offices, car lots, or an inventory of used cars other than cars that were in transit to the ports at any given time.

192.    Some of the United States used car buyers purchased cars for their own account; others simply retained a fee of a few hundred dollars for each car they bought.

193.    These used cars were then shipped to various ports in West Africa, including in Benin and Togo.

194.    According to the Treasury Finding and Amended Forfeiture Complaint, after the cars arrived in West Africa, Joumaa's and Salhab's networks and others purchased the vehicles using bulk currency generated from narcotics sales in Europe (primarily Spain) and Africa.

195.    For example, as detailed in the Amended Forfeiture Complaint, Salhab owned and controlled STE Nomeco SARL, which owned and operated used car lots in Benin. The used cars shipped from the United States were purchased in these and other used car lots using proceeds from Joumaa's international drug trafficking ring.

196.    According to the Amended Forfeiture Complaint, once the cars were sold, Salhab's money courier network transported the currency overland or by air from West Africa to Lebanon.

197.    When the currency arrived in Lebanon, it was deposited either in LCB accounts or with the Hassan Ayash Exchange or the Ellissa Exchange.

198.    Just as the Defendants caused LCB to effect the outgoing wire transfers on Hezbollah's behalf, they also caused LCB to conceal the vast sums of cash deposits coming into Hezbollah -controlled accounts following the sale of narcotics and the used cars.

199.    As early as September 2003, Defendant Safa, the Associate General Manager for Branches and Operations, started granting exceptions for certain LCB clients associated with Hezbollah from LCB's policy of requiring cash transaction slips ("CTS") for cash transactions greater than $10,000. CTSs required disclosure of the source of funds deposited and were filed with the Central Bank of Lebanon. The exempted Hezbollah -related clients included the Yousser Company, its subsidiary, the Farah Company for Tourism, and Senior Hezbollah leader and Bayt al-Mal head, Husayn al-Shami, among others.

200.    Safa could not have taken these steps without the approval of Defendants Abou Jaoude and Hamdoun, the chair and vice-chair, respectively, of LCB's Anti-Money Laundering Committee.

201.    Taken together, Safa, Abou Jaoude, and Hamdoun, permitted government-identified terrorists and terrorist organizations to deposit at least $200 million in cash per year without disclosing the source of the funds. The money laundering operation discussed herein, used these exceptions to funnel the proceeds of illegal narcotics sales and other illicit operations into the legitimate banking sector.

202.    By exempting known Hezbollah affiliates from the disclosure requirements, the Defendants enabled Hezbollah to deposit of hundreds of millions of dollars into LCB accounts and facilitated Hezbollah's use of LCB to conduct financial transactions despite the U.S. Sanctions Regime.

203.    Then, the process would begin again when the Defendants would enable the money transfers to the United States car buyers. However, significant amounts of money were siphoned off to finance Hezbollah's genocidal terrorism machine.

204.    Hezbollah required funds and financial services to plan, prepare for, and carry out its attacks on civilians and other terrorist attacks and crimes against humanity. Indeed, Hezbollah relies heavily upon international money laundering and drug trafficking proceeds to finance and support such terrorist attacks.

205.    Defendants knew that Hezbollah had this need, and purposefully caused LCB to provide financial support to Hezbollah as described herein. Hezbollah used such financial support to further its terror attacks on civilians and other acts of terrorism and crimes against humanity, including the Burgas Airport Attack.

206.    Defendants' support for Hezbollah's genocidal attacks is further established by the fact that Hezbollah is subject to strict economic sanctions imposed by the United States. Such sanctions are intended to prevent Hezbollah from conducting banking activities, and thereby limit its ability to carry out terrorist attacks and other crimes against humanity. During the period relevant hereto, however, LCB did not recognize or enforce the sanctions imposed by the United States, with Defendants ensuring that LCB and its officers and employees did not enforce these sanctions. They did so to permit the conduct of transactions benefitting Hezbollah through the Bank and thus to facilitate the funding of Hezbollah's violent activities.

207.    Ultimately, the Defendants' loyal and consistent dedication to Hezbollah and its terroristic and genocidal goals led to LCB's demise as an active bank. In the February 2011, Treasury Finding the U.S. Treasury designated LCB as a "primary money laundering concern" due to its extensive involvement with and support for Hezbollah. 76 Fed. Reg. 9403, Feb. 17, 2011. And, in December 2011, the United States brought the Civil Forfeiture Action against LCB, due to its wide-ranging Hezbollah -related activities dating back at least to 2002. *U.S. v. Lebanese Canadian Bank, SAL*, 11-cv-9186 (S.D.N.Y.).

208.    In June 2013, LCB settled the U.S. forfeiture action for $102 million, after giving up its banking license and transferring its assets and liabilities to Société Générale de Banque au Liban S.A.L. *See* "Stipulation and Order of Settlement Regarding Lebanese Canadian Bank and Société Générale de Banque au Liban S.A.L.," filed on June 26, 2013, in *U.S. v. Lebanese Canadian Bank SAL*, 11-Civ-9186 (S.D.N.Y.).

209.    As discussed above, Defendants Abou Jaoude and Hamdoun have maintained their grip on LCB and the flow of information regarding its Hezbollah money laundering activities. Ironically, both Abou Jaoude and Hamdoun are acting as liquidators for LCB.

**5.  The Attack**.

210.    On 18 July 2012, at 4:43 pm, or thereabout, Flight 392 of the Bulgarian national airline – AIR VIA – from Israel to Burgas, landed at the Sarafavo Airport, the airport of the city, Burgas, Bulgaria, which is located on the shore of the Black Sea.

211.    At 5:20 pm, or thereabout, after going through passport control and luggage collection, a group of Israeli tourists consisting of 43 people walked from the airport terminal toward a bus that waited in the airport parking lot to transport them to their hotels in Burgas.

212.    At 5:30 pm, or thereabout, a Hezbollah suicide bomber, carrying a large explosive device, blew himself up in close proximity to the bus, on which or near to which, the Israeli tourists were at that time.

213.    As a result of the explosion the bus caught fire, which was extinguished by local rescue forces after several minutes.

214.    After the Attack, the Burgas Airport was closed for several hours, and flights were diverted to other airports. Other flights were cancelled altogether.

**6.  The international community has universally condemned the financing of terrorism, thus incorporating this offense into the law of nations.**

215.    Among others, the following international conventions and/or United Nations Security Council Resolutions support the premise that the financing of terrorism is incorporated into the law of nations:

> i. The International Convention for the Suppression of the Financing of Terrorism, G.A. Res. 54/109, U.N. GA OR, 54th Sess., 76th mtg., Supp. No. 49, U.N. Doc. AJRes/53/108 (1999) (In force Apr. 2002).
>
> ii. Resolution 1267 (1999) of October 15, 1999 on the freezing of the funds and other financial resources of the Taliban.
>
> iii. Resolution 1269 (1999) of October 19, 1999 calling upon States to take steps to deny those who finance terrorist acts safe haven.

iv. Resolution 1333 (2000) of December 19, 2000 on the freezing of the funds and other resources of Usama bin Laden and the Al-Qaida organization.

v. Resolution 1363 (2001) of July 30, 2001 on the establishment of a mechanism to monitor the implementation of measures imposed by Resolutions 1267 (1999) and 1333 (2000).

vi. Resolution 1373 (2001) of September 28, 2001 on threats to international peace and security caused by terrorist acts, and mandating the formation of the Counter-Terrorism Committee.

vii. Resolution 1377 (2001) of November 12, 2001 calling upon States to implement fully Resolution 1373 (2001).

viii. Resolution 1390 (2002) of January 16, 2002 effectively merging the freezing measures of Resolutions 1267 (1999) and 1333 (2000).

ix. Resolution 1455 (2003) of January 17, 2003 on measures to improve the implementation of the freezing measures of Resolutions 1267 (1999), 1333 (2000), and 1390 (2002).

x. Resolution 1456 (2003) of January 29, 2003 reaffirming that "measures to detect and stem the flow of finance and funds for terrorist purposes must be urgently strengthened"; stating that States must "bring to justice those who finance... terrorist acts"; and urging States to become parties to the 1999 Terrorism Financing Convention; calling on Counter-Terrorism Committee to intensify efforts to implement Resolution 1373 (2001).

xi. Resolution 1526 (2004) of January 30, 2004 calling upon States to implement fully Resolution 1373 (2001) and to implement measures to improve the freezing measures of Resolutions 1267 (1999) and 1333 (2000).

xii. Resolution 1535 (2004) of March 26, 2004 calling upon States to implement fully Resolution 1373 (2001).

**7. The international community has universally condemned the crime of genocide, thus incorporating this offense into the law of nations.**

216.    Among others, the following international conventions and/or United Nations Security Council Resolutions support the premise that the crime of genocide is incorporated into the law of nations

i.      The Convention on the Prevention and Punishment of the Crime of Genocide ("Convention on Genocide"), 78 U.N.T.S. 277;

ii.      The Statute of the International Criminal Tribunal for the Former Yugoslavia ("Statute of the ICTY"), Art. 4 (adopted by the U.N. Security Council in Resolution No. 808 (May 3, 1993)), U.N. Doc. Sf25704;

iii.      The Statute of the International Criminal Tribunal for Rwanda ("Statute of the ICTR"), Art. 2 (adopted by the U.N. Security Council in Resolution No. 955), U.N. Doc. S/INF/50 (1994); and

iv.      The Rome Statute of the International Criminal Court, U.N. GAOR, 52d Sess., Annex II, at 4, U.N. Doc. A/CONF.183/9 (1998), Art. 6.

**8.  The international community has also universally condemned crimes against humanity, thus incorporating this offense into the law of nations.**

217.    Among others, the following international conventions and/or United Nations Security Council Resolutions support the premise that acts constituting crimes against humanity are incorporated into the law of nations:

i.      The Charter of the International Military Tribunal, Aug. 8, 1945, art. 61, 59 Stat. 1546, 1547, E.A.S. NO. 472, 82 U.N.T.S. 284;

ii.      The Statute of the International Criminal Tribunal for the Former Yugoslavia, Art. 5;

iii.      The Statute of the International Criminal Tribunal for Rwanda, Art. 3;

iv.      The Rome Statute of the International Criminal Court, Art. 7.

**9.  The Defendants' actions violate several international treaties to which the United States is a party.**

**a.  The International Convention for the Suppression of the Financing of Terrorism**

218.    The United Nations General Assembly promulgated the International Convention for the Suppression of the Financing of Terrorism in 1999, and it went into effect on April 10.

2002. The Terrorist Financing Convention recognizes international norms prohibiting the financing of attacks on civilian populations.

219.    An overwhelming majority of countries, including the United States, are parties to the Terrorism Financing Convention (189 countries are parties). And the overwhelming majority of states also were parties at the time of the Attack (177 state parties). Thus, the Terrorist Financing Convention sets forth norms of international law that are recognized by the overwhelming majority of nations.

220.    The Terrorism Financing Convention prohibits the provision of funds to a group with the knowledge and/or intent that such funds will be used, in whole or in part, to engage in terror attacks on civilians.

221.    International organizations agree that the Terrorism Financing Convention reflects established international-law norms. For example. the International Monetary Fund has referred to "legally binding international norms" prohibiting terrorist financing, "such as those contained in … the International Convention for the Suppression of the Financing of Terrorism," International Monetary Fund, Suppressing the Financing of Terrorism: A Handbook for Legislative Drafting. at l (2003). https://www.imf.org/external/pubs/nft/2003/sfth/pdf/SFTH.pdf (last visited on June 18, 2019).  Terror financing is specifically proscribed by a U.N. Security Council resolution, further showing that the Terrorism Financing Convention's prohibition of terrorist financing constitutes an established norm of international law. Creation of Counter Terrorism Committee. U.N. Doc. S/Res/1373. '11 (Sept. 28. 2001).

222.    The Terrorist Financing Convention imposes legal obligations on parties to enact implementing laws and regulations. *See* art. 4. The United States, among other nations, has done

so. *See* Suppression of the Financing of Terrorism Convention Implementation Act of 2002, Pub. L. No. 107-197, tit. II, § 202(a).

223.    Defendants have violated norms of international law recognized by the Terrorist Financing Convention by laundering funds for Hezbollah, with the knowledge and intent that such funds would be used, in whole or in part, to perpetrate terror attacks on civilians, including the Burgas Airport Attack. Hezbollah's terrorist attacks have included attacks in multiple countries, and the purpose of such attacks has been to intimidate civilian populations, and/or to compel government action.

### b.  The Terrorist Bombing Convention

224.    The United Nations General Assembly adopted the Terrorist Bombing Convention in 1997, and it went into effect on May 23, 2001.

225.    An overwhelming majority of countries are parties to the Convention (170 countries are parties). And the overwhelming majority of states also were parties at the time of the Attack (164 state parties). Thus, the Terrorist Bombing Convention sets forth norms of international law that are recognized by the overwhelming majority of nations.

226.    The Terrorist Bombing Convention prohibits any person from unlawfully and intentionally delivering, placing, discharging, or detonating an explosive or other lethal device in a place of public use, a State or government facility, a public transportation system or an infrastructure facility, where the actor intends to cause death, serious bodily harm, or major economic loss.

227.    A person similarly violates the Terrorist Bombing Convention if that person participates as an accomplice, organizes, or directs others, or contributes in any way to a violation of the Convention. See Article 2.

228.    International organizations agree that the Terrorist Bombing Convention reflects established international-law norms.

229.    Defendants have violated norms of international law recognized by the Terrorist Bombing Convention by conspiring with Hezbollah, aiding and abetting and otherwise enabling Hezbollah's delivering, placing, discharging, or detonating an explosive or other lethal device in a place of public use, a State or government facility, a public transportation system or an infrastructure facility, where the actor intends to cause death, serious bodily harm, or major economic loss. Defendants acted with the knowledge that their conduct would contribute to Hezbollah's terrorist bombings, such as the Burgas Airport Attack.

   c.   **The Convention for the Suppression of Unlawful Acts against the Safety of Civil Aviation and the Protocol for the Suppression of Unlawful Acts of Violence at Airports serving International Civil Aviation ("Montreal Protocol").**

230.    The Convention for the Suppression of Unlawful Acts against the Safety of Civil Aviation is a multilateral treaty that became effective in 1973. It was supplemented by the Protocol for the Suppression of Unlawful Acts of Violence at Airports serving International Civil Aviation ("Montreal Protocol") in 1988. The 1973 Convention and the 1988 Montreal Protocol are deemed a single instrument and are referred to herein as the "Montreal Convention."

231.    An overwhelming majority of countries are parties to the Montreal Convention (175 out of 195), all of which were parties to the Montreal Convention at the time of the Attack. Thus, the Montreal Convention sets forth norms of international law that are recognized by the overwhelming majority of nations.

232.    A person commits an offense under the Montreal Convention when that person unlawfully and intentionally, using a device, substance, or weapon (a) performs an act of violence against a person at an airport serving international civil aviation which causes or is likely to cause

serious injury or death; or (b) destroys or seriously damages the facilities of an airport serving international civil aviation or aircraft not in service located thereon or disrupts the services of the airport.

233.    A person similarly violates the Montreal Convention if that person attempts to commit an offense or participates as an accomplice to a person who commits or attempts to commit an offense of the Montreal Convention.

234.    International organizations agree that the Montreal Convention reflects established international-law norms.

235.    The United States has enacted enabling legislation giving effect to the provisions of the Montreal Convention. See 18 U.S.C. §§ 32, 37.

236.    Defendants have violated norms of international law recognized by the Montreal Convention by conspiring with Hezbollah, aiding and abetting and otherwise enabling Hezbollah's using a device, substance, or weapon to (a) perform an act of violence against a person at an airport serving international civil aviation which causes or is likely to cause serious injury or death; or to (b) destroy or seriously damage the facilities of an airport serving international civil aviation or aircraft not in service located thereon or disrupts the services of the airport.  Defendants acted with the knowledge and intent that their conduct would contribute to Hezbollah's acts of violence at international airports, including the Burgas Airport Attack and Hezbollah's unsuccessful attempt to carry out a similar attack against Israeli or Jewish tourists in Larnaca, Cyprus.

237.    Defendants' conduct alleged herein were tortious acts that violated the law of nations and treaties of the United States. The Plaintiffs were injured by those tortious acts.

**10. Damages**.

238.    Decedent, Amir Menashe, was murdered in the Attack. The murder of Amir Menashe caused decedent, his estate, and plaintiffs, Natalie Menashe, R.M. (minor), Yitzchak Menashe, Yehudit Menashe, Tali Menashe Apter, and Ofir Menashe, severe injury, including: pain and suffering; pecuniary loss and loss of income; loss of guidance, companionship and society; loss of consortium; severe emotional distress and mental anguish; and loss of solatium.

239.    Decedent, Elior Preis, was murdered in the Attack. The murder of Elior Preis caused decedent, his estate, and plaintiffs, Yaakov Preis, Edna Preis, Sarit Peri, and Liat Frost severe injury, including: pain and suffering; pecuniary loss and loss of income; loss of guidance, companionship and society; loss of consortium; severe emotional distress and mental anguish; and loss of solatium.

240.    Decedent, Maor-Machluf ("Maor") Haroush, was murdered in the Attack. The murder of Maor Haroush caused decedent, his estate, and plaintiffs, Binyamin Haroush, Orit Haroush, Elin Tiran, Shirli Timor, Sagit Rubin, and Chen Gold severe injury, including: pain and suffering; pecuniary loss and loss of income; loss of guidance, companionship and society; loss of consortium; severe emotional distress and mental anguish; and loss of solatium.

241.    Decedent, Yitzchak Kolangi, was murdered in the Attack. The murder of Yitzchak Kolangi caused decedent, his estate, and plaintiffs, Gilat Kolangi, N.K. (minor), Yaakov Kolangi, Rina Kolangi, Niva Sigawi, Yael Maman, and David Kolangi, severe injury, including: pain and suffering; pecuniary loss and loss of income; loss of guidance, companionship and society; loss of consortium; severe emotional distress and mental anguish; and loss of solatium.

242.    Decedent, Kochava Shriki, was murdered in the Attack and her unborn fetus was also killed in the Attack. The murder of Kochava Shriki and the death of her unborn fetus caused decedent, her estate, and plaintiffs, Yitzchak Shriki, Zehava Binyamin, Dorit Cohen, Avraham

Oss, Nurit Cohen, Yael Morad, Ruth "Ruti" Gamliel, and Esther Tibi, severe injury, including: pain and suffering; pecuniary loss and loss of income; loss of guidance, companionship and society; loss of consortium; severe emotional distress and mental anguish; and loss of solatium.

243.   In addition to the damages resulting from the murder of her husband, Amir Menashe (above), Plaintiff Natalie Menashe was present at the bus at the time of the Attack and was seriously injured in the Attack, was placed in extreme fear of immediate death or serious physical injury, witnessed the explosion and the murder and maiming of the other victims, among many other horrifying sights, and suffered severe physical and other injuries as a result, including: wounds, disfigurement, sutures, and loss of physical functions; extreme pain and suffering; severe emotional distress and mental anguish; loss of guidance, companionship, and society; loss of consortium; loss of solatium; and pecuniary loss and loss of income.

244.   In addition to the damages resulting from the murder of her husband, Yitzchak Kolangi (above), Plaintiff Gilat Kolangi was present at the bus at the time of the Attack and was seriously injured in the Attack, was placed in extreme fear of immediate death or serious physical injury, witnessed the explosion and the murder and maiming of the other victims, among many other horrifying sights, and suffered severe physical and other injuries as a result, including: wounds, disfigurement, sutures, and loss of physical functions; extreme pain and suffering; severe emotional distress and mental anguish; loss of guidance, companionship, and society; loss of consortium; loss of solatium; and pecuniary loss and loss of income.

245.   In addition to the damages resulting from the murder of his wife, Kochava Shriki and their unborn fetus (above), Plaintiff Yitzchak Shriki was present at the bus at the time of the Attack and was seriously injured in the Attack, was placed in extreme fear of immediate death or serious physical injury, witnessed the explosion and the murder and maiming of the other victims,

among many other horrifying sights, and suffered severe physical and other injuries as a result, including: wounds, disfigurement, sutures, and loss of physical functions; extreme pain and suffering; severe emotional distress and mental anguish; loss of guidance, companionship, and society; loss of consortium; loss of solatium; and pecuniary loss and loss of income.

246.    Plaintiff, Simon Jini was present at the bus at the time of the Attack and was seriously injured in the Attack, was placed in extreme fear of immediate death or serious physical injury, witnessed the explosion and the murder and maiming of the other victims, among many other horrifying sights, and suffered severe physical and other injuries as a result, including: wounds, disfigurement, sutures, and loss of physical functions; extreme pain and suffering; severe emotional distress and mental anguish; loss of guidance, companionship, and society; loss of consortium; loss of solatium; and pecuniary loss and loss of income.

247.    Plaintiff, Adi Algrasi was present at the bus at the time of the Attack and was seriously injured in the Attack, was placed in extreme fear of immediate death or serious physical injury, witnessed the explosion and the murder and maiming of the other victims, among many other horrifying sights, and suffered severe physical and other injuries as a result, including: wounds, disfigurement, sutures, and loss of physical functions; extreme pain and suffering; severe emotional distress and mental anguish; loss of guidance, companionship, and society; loss of consortium; loss of solatium; and pecuniary loss and loss of income.

248.    Plaintiff, Levana Algrasi was present at the bus at the time of the Attack and was seriously injured in the Attack, was placed in extreme fear of immediate death or serious physical injury, witnessed the explosion and the murder and maiming of the other victims, among many other horrifying sights, and suffered severe physical and other injuries as a result, including: wounds, disfigurement, sutures, and loss of physical functions; extreme pain and suffering; severe

emotional distress and mental anguish; loss of guidance, companionship, and society; loss of consortium; loss of solatium; and pecuniary loss and loss of income.

249.    Plaintiff, Yosef Algrasi was present at the bus at the time of the Attack and was seriously injured in the Attack, was placed in extreme fear of immediate death or serious physical injury, witnessed the explosion and the murder and maiming of the other victims, among many other horrifying sights, and suffered severe physical and other injuries as a result, including: wounds, disfigurement, sutures, and loss of physical functions; extreme pain and suffering; severe emotional distress and mental anguish; loss of guidance, companionship, and society; loss of consortium; loss of solatium; and pecuniary loss and loss of income.

250.    Plaintiff, Stas Antonov was present at the bus at the time of the Attack and was seriously injured in the Attack, was placed in extreme fear of immediate death or serious physical injury, witnessed the explosion and the murder and maiming of the other victims, among many other horrifying sights, and suffered severe physical and other injuries as a result, including: wounds, disfigurement, sutures, and loss of physical functions; extreme pain and suffering; severe emotional distress and mental anguish; loss of guidance, companionship, and society; loss of consortium; loss of solatium; and pecuniary loss and loss of income.

251.    Plaintiff, Anat Cohen, was present at the bus at the time of the Attack and was seriously injured in the Attack, was placed in extreme fear of immediate death or serious physical injury, witnessed the explosion and the murder and maiming of the other victims, among many other horrifying sights, and suffered severe physical and other injuries as a result, including: wounds, disfigurement, sutures, and loss of physical functions; extreme pain and suffering; severe emotional distress and mental anguish; loss of guidance, companionship, and society; loss of consortium; loss of solatium; and pecuniary loss and loss of income.

252.    Plaintiff, Daniel Fathima, was present at the bus at the time of the Attack and was seriously injured in the Attack, was placed in extreme fear of immediate death or serious physical injury, witnessed the explosion and the murder and maiming of the other victims, among many other horrifying sights, and suffered severe physical and other injuries as a result, including: wounds, disfigurement, sutures, and loss of physical functions; extreme pain and suffering; severe emotional distress and mental anguish; loss of guidance, companionship, and society; loss of consortium; loss of solatium; and pecuniary loss and loss of income.

253.    Plaintiff, Amit Kuza, was present at the bus at the time of the Attack and was seriously injured in the Attack, was placed in extreme fear of immediate death or serious physical injury, witnessed the explosion and the murder and maiming of the other victims, among many other horrifying sights, and suffered severe physical and other injuries as a result, including: wounds, disfigurement, sutures, and loss of physical functions; extreme pain and suffering; severe emotional distress and mental anguish; loss of guidance, companionship, and society; loss of consortium; loss of solatium; and pecuniary loss and loss of income.

254.    Plaintiff, Vered Kuza, was present at the bus at the time of the Attack and was seriously injured in the Attack, was placed in extreme fear of immediate death or serious physical injury, witnessed the explosion and the murder and maiming of the other victims, among many other horrifying sights, and suffered severe physical and other injuries as a result, including: wounds, disfigurement, sutures, and loss of physical functions; extreme pain and suffering; severe emotional distress and mental anguish; loss of guidance, companionship, and society; loss of consortium; loss of solatium; and pecuniary loss and loss of income.

255.    Plaintiff, Hana Levi, was present at the bus at the time of the Attack and was seriously injured in the Attack, was placed in extreme fear of immediate death or serious physical

injury, witnessed the explosion and the murder and maiming of the other victims, among many other horrifying sights, and suffered severe physical and other injuries as a result, including: wounds, disfigurement, sutures, and loss of physical functions; extreme pain and suffering; severe emotional distress and mental anguish; loss of guidance, companionship, and society; loss of consortium; loss of solatium; and pecuniary loss and loss of income.

256.    Plaintiff, Gal Malka, was present at the bus at the time of the Attack and was seriously injured in the Attack, was placed in extreme fear of immediate death or serious physical injury, witnessed the explosion and the murder and maiming of the other victims, among many other horrifying sights, and suffered severe physical and other injuries as a result, including: wounds, disfigurement, sutures, and loss of physical functions; extreme pain and suffering; severe emotional distress and mental anguish; loss of guidance, companionship, and society; loss of consortium; loss of solatium; and pecuniary loss and loss of income.

257.    Plaintiff, Moshe Moseri, was present at the bus at the time of the Attack and was seriously injured in the Attack, was placed in extreme fear of immediate death or serious physical injury, witnessed the explosion and the murder and maiming of the other victims, among many other horrifying sights, and suffered severe physical and other injuries as a result, including: wounds, disfigurement, sutures, and loss of physical functions; extreme pain and suffering; severe emotional distress and mental anguish; loss of guidance, companionship, and society; loss of consortium; loss of solatium; and pecuniary loss and loss of income.

258.    Plaintiff, Shalom Sarid, was present at the bus at the time of the Attack and was seriously injured in the Attack, was placed in extreme fear of immediate death or serious physical injury, witnessed the explosion and the murder and maiming of the other victims, among many other horrifying sights, and suffered severe physical and other injuries as a result, including:

wounds, disfigurement, sutures, and loss of physical functions; extreme pain and suffering; severe emotional distress and mental anguish; loss of guidance, companionship, and society; loss of consortium; loss of solatium; and pecuniary loss and loss of income.

259.    Plaintiff, Malka Sarid, was present at the bus at the time of the Attack and was seriously injured in the Attack, was placed in extreme fear of immediate death or serious physical injury, witnessed the explosion and the murder and maiming of the other victims, among many other horrifying sights, and suffered severe physical and other injuries as a result, including: wounds, disfigurement, sutures, and loss of physical functions; extreme pain and suffering; severe emotional distress and mental anguish; loss of guidance, companionship, and society; loss of consortium; loss of solatium; and pecuniary loss and loss of income.

260.    Plaintiff, Avi Shahar, was present at the bus at the time of the Attack and was seriously injured in the Attack, was placed in extreme fear of immediate death or serious physical injury, witnessed the explosion and the murder and maiming of the other victims, among many other horrifying sights, and suffered severe physical and other injuries as a result, including: wounds, disfigurement, sutures, and loss of physical functions; extreme pain and suffering; severe emotional distress and mental anguish; loss of guidance, companionship, and society; loss of consortium; loss of solatium; and pecuniary loss and loss of income.

261.    Plaintiff, Ziv Shahar was present at the bus at the time of the Attack and was seriously injured in the Attack, was placed in extreme fear of immediate death or serious physical injury, witnessed the explosion and the murder and maiming of the other victims, among many other horrifying sights, and suffered severe physical and other injuries as a result, including: wounds, disfigurement, sutures, and loss of physical functions; extreme pain and suffering; severe

emotional distress and mental anguish; loss of guidance, companionship, and society; loss of consortium; loss of solatium; and pecuniary loss and loss of income.

262.   Plaintiff, Hadar Shahar, was present at the bus at the time of the Attack and was seriously injured in the Attack, was placed in extreme fear of immediate death or serious physical injury, witnessed the explosion and the murder and maiming of the other victims, among many other horrifying sights, and suffered severe physical and other injuries as a result, including: wounds, disfigurement, sutures, and loss of physical functions; extreme pain and suffering; severe emotional distress and mental anguish; loss of guidance, companionship, and society; loss of consortium; loss of solatium; and pecuniary loss and loss of income.

263.   Plaintiff, Yoram Shahar-Sabach, was present at the bus at the time of the Attack and was seriously injured in the Attack, was placed in extreme fear of immediate death or serious physical injury, witnessed the explosion and the murder and maiming of the other victims, among many other horrifying sights, and suffered severe physical and other injuries as a result, including: wounds, disfigurement, sutures, and loss of physical functions; extreme pain and suffering; severe emotional distress and mental anguish; loss of guidance, companionship, and society; loss of consortium; loss of solatium; and pecuniary loss and loss of income.

264.   Plaintiff, Miriam Shahar-Sabach, was present at the bus at the time of the Attack and was seriously injured in the Attack, was placed in extreme fear of immediate death or serious physical injury, witnessed the explosion and the murder and maiming of the other victims, among many other horrifying sights, and suffered severe physical and other injuries as a result, including: wounds, disfigurement, sutures, and loss of physical functions; extreme pain and suffering; severe emotional distress and mental anguish; loss of guidance, companionship, and society; loss of consortium; loss of solatium; and pecuniary loss and loss of income.

265.    Plaintiff, Matan Shahar-Sabach, was present at the bus at the time of the Attack and was seriously injured in the Attack, was placed in extreme fear of immediate death or serious physical injury, witnessed the explosion and the murder and maiming of the other victims, among many other horrifying sights, and suffered severe physical and other injuries as a result, including: wounds, disfigurement, sutures, and loss of physical functions; extreme pain and suffering; severe emotional distress and mental anguish; loss of guidance, companionship, and society; loss of consortium; loss of solatium; and pecuniary loss and loss of income.

266.    Plaintiff, Linoy Shahar-Sabach, was present at the bus at the time of the Attack and was seriously injured in the Attack, was placed in extreme fear of immediate death or serious physical injury, witnessed the explosion and the murder and maiming of the other victims, among many other horrifying sights, and suffered severe physical and other injuries as a result, including: wounds, disfigurement, sutures, and loss of physical functions; extreme pain and suffering; severe emotional distress and mental anguish; loss of guidance, companionship, and society; loss of consortium; loss of solatium; and pecuniary loss and loss of income.

267.    Plaintiff, Chen Shahar Sabach, was present at the bus at the time of the Attack and was seriously injured in the Attack, was placed in extreme fear of immediate death or serious physical injury, witnessed the explosion and the murder and maiming of the other victims, among many other horrifying sights, and suffered severe physical and other injuries as a result, including: wounds, disfigurement, sutures, and loss of physical functions; extreme pain and suffering; severe emotional distress and mental anguish; loss of guidance, companionship, and society; loss of consortium; loss of solatium; and pecuniary loss and loss of income.

268.    Plaintiff, Roman Shuster, was present at the bus at the time of the Attack and was seriously injured in the Attack, was placed in extreme fear of immediate death or serious physical

injury, witnessed the explosion and the murder and maiming of the other victims, among many other horrifying sights, and suffered severe physical and other injuries as a result, including: wounds, disfigurement, sutures, and loss of physical functions; extreme pain and suffering; severe emotional distress and mental anguish; loss of guidance, companionship, and society; loss of consortium; loss of solatium; and pecuniary loss and loss of income.

269.    Plaintiff, Raymond Siboni, was present at the bus at the time of the Attack and was seriously injured in the Attack, was placed in extreme fear of immediate death or serious physical injury, witnessed the explosion and the murder and maiming of the other victims, among many other horrifying sights, and suffered severe physical and other injuries as a result, including: wounds, disfigurement, sutures, and loss of physical functions; extreme pain and suffering; severe emotional distress and mental anguish; loss of guidance, companionship, and society; loss of consortium; loss of solatium; and pecuniary loss and loss of income.

270.    Plaintiff, Gad "Gadi" Siboni, was present at the bus at the time of the Attack and was seriously injured in the Attack, was placed in extreme fear of immediate death or serious physical injury, witnessed the explosion and the murder and maiming of the other victims, among many other horrifying sights, and suffered severe physical and other injuries as a result, including: wounds, disfigurement, sutures, and loss of physical functions; extreme pain and suffering; severe emotional distress and mental anguish; loss of guidance, companionship, and society; loss of consortium; loss of solatium; and pecuniary loss and loss of income.

271.    Plaintiff, Vadislav Batlin, was present at the bus at the time of the Attack and was seriously injured in the Attack, was placed in extreme fear of immediate death or serious physical injury, witnessed the explosion and the murder and maiming of the other victims, among many other horrifying sights, and suffered severe physical and other injuries as a result, including:

wounds, disfigurement, sutures, and loss of physical functions; extreme pain and suffering; severe emotional distress and mental anguish; loss of guidance, companionship, and society; loss of consortium; loss of solatium; and pecuniary loss and loss of income.

272.   Plaintiff, Penina Moshe, was present at the bus at the time of the Attack and was seriously injured in the Attack, was placed in extreme fear of immediate death or serious physical injury, witnessed the explosion and the murder and maiming of the other victims, among many other horrifying sights, and suffered severe physical and other injuries as a result, including: wounds, disfigurement, sutures, and loss of physical functions; extreme pain and suffering; severe emotional distress and mental anguish; loss of guidance, companionship, and society; loss of consortium; loss of solatium; and pecuniary loss and loss of income.

273.   Plaintiff, Ron Farhan, was present at the bus at the time of the Attack and was seriously injured in the Attack, was placed in extreme fear of immediate death or serious physical injury, witnessed the explosion and the murder and maiming of the other victims, among many other horrifying sights, and suffered severe physical and other injuries as a result, including: wounds, disfigurement, sutures, and loss of physical functions; extreme pain and suffering; severe emotional distress and mental anguish; loss of guidance, companionship, and society; loss of consortium; loss of solatium; and pecuniary loss and loss of income.

274.   Plaintiff, Adam Ben Sheetrit, was present at the bus at the time of the Attack and was seriously injured in the Attack, was placed in extreme fear of immediate death or serious physical injury, witnessed the explosion and the murder and maiming of the other victims, among many other horrifying sights, and suffered severe physical and other injuries as a result, including: wounds, disfigurement, sutures, and loss of physical functions; extreme pain and suffering; severe

emotional distress and mental anguish; loss of guidance, companionship, and society; loss of consortium; loss of solatium; and pecuniary loss and loss of income.

275.    Plaintiff, Yael Ben Sheetrit, was present at the bus at the time of the Attack and was seriously injured in the Attack, was placed in extreme fear of immediate death or serious physical injury, witnessed the explosion and the murder and maiming of the other victims, among many other horrifying sights, and suffered severe physical and other injuries as a result, including: wounds, disfigurement, sutures, and loss of physical functions; extreme pain and suffering; severe emotional distress and mental anguish; loss of guidance, companionship, and society; loss of consortium; loss of solatium; and pecuniary loss and loss of income.

276.    Plaintiff, Vadim Talalaev, was present at the bus at the time of the Attack and was seriously injured in the Attack, was placed in extreme fear of immediate death or serious physical injury, witnessed the explosion and the murder and maiming of the other victims, among many other horrifying sights, and suffered severe physical and other injuries as a result, including: wounds, disfigurement, sutures, and loss of physical functions; extreme pain and suffering; severe emotional distress and mental anguish; loss of guidance, companionship, and society; loss of consortium; loss of solatium; and pecuniary loss and loss of income.

277.    Plaintiff, Yevgenya Talalaev, was present at the bus at the time of the Attack and was seriously injured in the Attack, was placed in extreme fear of immediate death or serious physical injury, witnessed the explosion and the murder and maiming of the other victims, among many other horrifying sights, and suffered severe physical and other injuries as a result, including: wounds, disfigurement, sutures, and loss of physical functions; extreme pain and suffering; severe emotional distress and mental anguish; loss of guidance, companionship, and society; loss of consortium; loss of solatium; and pecuniary loss and loss of income.

278.     Plaintiff, E.T. (minor) was a fetus in the womb of her mother, Plaintiff Yevgenya Talalaev, at the time of the Attack. As a result of the Attack, she was born with serious handicaps, and suffers loss of physical functions; extreme pain and suffering; severe emotional distress and mental anguish; loss of guidance, companionship, and society; loss of consortium; loss of solatium; and pecuniary loss and loss of income.

279.     Plaintiff, Dorit Haroush, was present at the bus at the time of the Attack and was seriously injured in the Attack, was placed in extreme fear of immediate death or serious physical injury, witnessed the explosion and the murder and maiming of the other victims, among many other horrifying sights, and suffered severe physical and other injuries as a result, including: wounds, disfigurement, sutures, and loss of physical functions; extreme pain and suffering; severe emotional distress and mental anguish; loss of guidance, companionship, and society; loss of consortium; loss of solatium; and pecuniary loss and loss of income.

280.     Plaintiff, Benzion Haroush, was present at the bus at the time of the Attack and was seriously injured in the Attack, was placed in extreme fear of immediate death or serious physical injury, witnessed the explosion and the murder and maiming of the other victims, among many other horrifying sights, and suffered severe physical and other injuries as a result, including: wounds, disfigurement, sutures, and loss of physical functions; extreme pain and suffering; severe emotional distress and mental anguish; loss of guidance, companionship, and society; loss of consortium; loss of solatium; and pecuniary loss and loss of income.

281.     Plaintiff, Rachel Jerbi, was present at the bus at the time of the Attack and was seriously injured in the Attack, was placed in extreme fear of immediate death or serious physical injury, witnessed the explosion and the murder and maiming of the other victims, among many other horrifying sights, and suffered severe physical and other injuries as a result, including:

wounds, disfigurement, sutures, and loss of physical functions; extreme pain and suffering; severe emotional distress and mental anguish; loss of guidance, companionship, and society; loss of consortium; loss of solatium; and pecuniary loss and loss of income.

282. Plaintiff, Michael Pizitsky, was present at the bus at the time of the Attack and was seriously injured in the Attack, was placed in extreme fear of immediate death or serious physical injury, witnessed the explosion and the murder and maiming of the other victims, among many other horrifying sights, and suffered severe physical and other injuries as a result, including: wounds, disfigurement, sutures, and loss of physical functions; extreme pain and suffering; severe emotional distress and mental anguish; loss of guidance, companionship, and society; loss of consortium; loss of solatium; and pecuniary loss and loss of income.

283. Plaintiff, Rachel Eidelman, was present at the bus at the time of the Attack and was seriously injured in the Attack, was placed in extreme fear of immediate death or serious physical injury, witnessed the explosion and the murder and maiming of the other victims, among many other horrifying sights, and suffered severe physical and other injuries as a result, including: wounds, disfigurement, sutures, and loss of physical functions; extreme pain and suffering; severe emotional distress and mental anguish; loss of guidance, companionship, and society; loss of consortium; loss of solatium; and pecuniary loss and loss of income.

284. Plaintiff, Semyon Eidelman, was present at the bus at the time of the Attack and was seriously injured in the Attack, was placed in extreme fear of immediate death or serious physical injury, witnessed the explosion and the murder and maiming of the other victims, among many other horrifying sights, and suffered severe physical and other injuries as a result, including: wounds, disfigurement, sutures, and loss of physical functions; extreme pain and suffering; severe

emotional distress and mental anguish; loss of guidance, companionship, and society; loss of consortium; loss of solatium; and pecuniary loss and loss of income.

285.    Plaintiff, Marina Nahshonov Simhayev, was present at the bus at the time of the Attack and was seriously injured in the Attack, was placed in extreme fear of immediate death or serious physical injury, witnessed the explosion and the murder and maiming of the other victims, among many other horrifying sights, and suffered severe physical and other injuries as a result, including: wounds, disfigurement, sutures, and loss of physical functions; extreme pain and suffering; severe emotional distress and mental anguish; loss of guidance, companionship, and society; loss of consortium; loss of solatium; and pecuniary loss and loss of income.

286.    Plaintiff, Ludmila Nahshonov, was present at the bus at the time of the Attack and was seriously injured in the Attack, was placed in extreme fear of immediate death or serious physical injury, witnessed the explosion and the murder and maiming of the other victims, among many other horrifying sights, and suffered severe physical and other injuries as a result, including: wounds, disfigurement, sutures, and loss of physical functions; extreme pain and suffering; severe emotional distress and mental anguish; loss of guidance, companionship, and society; loss of consortium; loss of solatium; and pecuniary loss and loss of income.

**11. The Plaintiffs' Deaths and Injuries are the Result of Defendants' Conduct.**

287.    Terrorist organizations such as Hezbollah need banking services, including the ability to transfer funds internationally through wire transfers, in order to operate, and in order to plan, to prepare for and to carry out terrorist attacks.

288.    As the most powerful global terrorist organizations, Hezbollah needs banking services, to grow and to maintain its broad power and influence and its ability to carry out large scale, international mass casualty terrorist attacks like the Burgas Airport Attack.

289.    The Defendants' provision of wire transfer services, deposit accounts, and other banking services to Hezbollah, its affiliates, and agents enabled Hezbollah to operate and to plan, to prepare for and to carry out genocidal terrorist attacks, and enhanced Hezbollah's ability to plan, to prepare for and to carry out such attacks.

290.    Defendants' provision of banking services to enabled Hezbollah to generate, transfer, receive, and conceal the funds necessary for planning, preparing and carrying out Hezbollah's genocidal terrorist activity, including bombing attacks on civilians and civilian aviation, generally and the Burgas Airport Attack, in particular.

291.    Defendants' manipulation of LCB to provide banking services to Hezbollah, substantially increased and facilitated Hezbollah's ability to plan, to prepare for and to carry out genocidal terrorist attacks on civilians, including the Burgas Airport Attack.

292.    But for the Defendants' conduct alleged herein, Hezbollah's ability (a) to build and maintain its operational infrastructure for the planning and execution of the genocidal terrorist attacks including the Burgas Airport Attack; (b) to pay, train, transport and shelter the terrorist operatives who carried out the Burgas Airport Attack; and (c) to carry out the Burgas Airport Attack, would have been severely limited.

293.    Hezbollah planned, made the preparations necessary for and carried out the Burgas Airport Attack utilizing funds received by Hezbollah as part of the money laundering scheme detailed herein and the Hezbollah Wire Transfers and/or utilizing funds that were freed up and/or otherwise made available to Hezbollah as a result of the money laundering scheme and Hezbollah Wire Transfers, and/or using funds drawn from a pool of funds created in part by the money laundering scheme and the Hezbollah Wire Transfers.

294.    The funds received by Hezbollah as part of the money laundering scheme and the Hezbollah Wire Transfers were sufficient to carry out the Burgas Airport Attack which killed the decedents and harmed the remaining Plaintiffs.

295.    The Burgas Airport Attack was enabled, facilitated and carried out by and as the result of the Defendants' conduct described herein.

296.    The Burgas Airport Attack was thereby enabled, facilitated, and proximately, legally, and in fact caused by the Defendants' conduct described herein.

297.    The decedents' deaths and the Plaintiffs' injuries are therefore the direct, factual, legal, and proximate result of Defendants' conduct.

**FIRST CAUSE OF ACTION**
**PURSUANT TO THE ALIEN TORT CLAIMS ACT**
**AIDING AND ABETTING AND CONSPIRACY TO COMMIT CRIMES AGAINST**
**HUMANITY INCLUDING ACTS OF GENOCIDE**
**IN VIOLATION OF THE LAW OF NATIONS**

298.    Plaintiffs incorporate herein by reference the allegations contained in the preceding paragraphs.

299.    The acts of Hezbollah described above constitute torts within the meaning of the Alien Tort Claims Act, 28 U.S.C. §1350, and are clear violations of the law of nations, in that they violate international legal norms prohibiting acts of murder, torture, and terrorism committed in the pursuit of genocide, war crimes, and crimes against humanity, as well as terrorist financing.

300.    Hezbollah's bombing of innocent civilians with the intent to kill, maim, paralyze, and burn innocent civilian men, women, children, and the elderly are heinous and depraved acts of barbarity that violate definable, universal international norms.

301.    Defendants knowingly and intentionally aided and abetted Hizballah's heinous violations of the law of nations.

302. Defendants also conspired with Hezbollah in the commission of the violations of the law of nations described herein.

303. Specifically, Defendants aided and abetted and were accomplices in the planning, preparation, or execution of the crimes described above. Defendants provided organized and systematic financial support, financial services, money laundering, other practical assistance, encouragement and moral support, all of which substantially aided the perpetration of the Burgas Airport Bombing. Defendants did so with knowledge that their actions would assist Hezbollah in the commission of these crimes. Defendants furthermore violated the law of nations and recognized international legal norms by engaging in terrorist financing.

304. The Defendants' actions in violation of the law of nations and treaties of the United States caused the decedents' deaths and the Plaintiffs' injuries, and damages. Defendants' aiding and abetting acts of genocidal terrorism and terrorist financing in violation of the law of nations and treaties of the United States were the proximate cause of the death, injuries, and damages suffered by Plaintiffs.

305. Genocide has been universally recognized as a violation of a clear and definite norm of international that is universally accepted by the civilized world. Genocide is so widely condemned that it has achieved the status of *jus cogens* violation, and, therefore, is a violation of the law of nations such that the commission of genocide by a party subjects it to liability under the ATCA.

306. The Convention on the Prevention and Punishment of the Crime of Genocide ("Convention on Genocide"), 78 U.N.T.S. 277, adopted in 1948 and ratified by more than 136 nations, defines "genocide" as: "[a]ny of the following acts committed with intent to destroy, in whole or in part, a national, ethnical, racial, or religious group, as such: (a) killing members of the

group; (b) causing serious bodily injury or mental harm to members of the group; (c) deliberately inflicting on the group conditions of life calculated to bring about its physical destruction in whole or in part." The Convention goes on to note that "persons committing genocide shall be punished, whether they are constitutionally responsible rulers, public officials or private individuals."

307.    On November 4, 1988, the Genocide Convention Implementation Act of 1987 (the Proxmire Act), Pub. L. 100-606, was signed into law by President Ronald Reagan. As stated in the text of Senate Resolution 307 (107th Congress, 2nd Session), by this action, the United States Code (18 U.S.C. § 1091) was amended "to criminalize genocide under the United States law." Senate Resolution 307 further called upon "the people and Government of the United States to rededicate themselves to the cause of bringing an end to the crime of genocide (as postulated under international law and with passage of this act under US law)."

308.    Genocide is defined with a specificity sufficiently comparable to international law violations that were familiar when the ATCA was enacted. Genocide is therefore a violation of the Law of Nations actionable under the ATCA for private actors.

309.    Hezbollah is and was engaged in a campaign of genocide. For more than three decades, Hizballah has engaged in a campaign to deliberately kill and injure both Israeli and non-Israeli Jewish civilians in all parts of the world.

310.    Hezbollah's genocidal terrorist acts, that, by Hezbollah's own admission, are intended to kill Jews for the sake of killing Jews place Hezbollah among the enemies of all mankind.

311.    Hezbollah has also expressed its intent and desire to destroy the State of Israel and it has taken concrete steps to realize this goal. The numerous, repeated, persistent and indiscriminate missile attacks Hezbollah has launched towards civilian centers in Israel's north is

a prime example of Hezbollah's genocidal activities. The Hezbollah missile attacks directed at Israel's civilian population climaxed in the summer of 2006 when Hezbollah fired thousands of rockets and missiles at civilians in northern Israel, killing 43 civilians and injuring 1384 others. Throughout the month-long barrage, Hezbollah's missile fire forced approximately one million Israeli civilians to remain near or in bomb shelters or security rooms, and compelled approximately 250,000 civilians to evacuate northern Israel and relocate to other areas of the country.

312.   Another well-known genocidal Hezbollah attack was the 1994 bombing of the Jewish community center in Buenos Aires, Argentina, in which Hezbollah killed 85 innocent people and injured over 200.

313.   The Burgas Airport Attack targeting Jewish Israeli civilians far from the Middle East is another example of Hezbollah's genocidal campaign against Jews. These acts fit squarely within the well-settled international law definition of genocide as set forth in the Genocide Convention.

314.   Of course, Hezbollah does not restrict its barbaric terrorist attacks to Jews. As discussed above, Hezbollah has often targeted American civilians and service members. And it has unleashed its brutality upon the civilian population of Syria. However, Hezbollah operatives claim that with regard to most of its victims, "Hizballah does not kill just to kill." But violence against Jews and Israelis is different and they are "always a target" for Hezbollah. And, that is why Hezbollah's attacks against Jews and Israelis constitutes genocide.

315.   Article 3 of the Convention on Genocide notes that among the acts which are punishable are "(a) Genocide; (b) Conspiracy to commit genocide; (c) Direct and public incitement to commit genocide; (d) Attempt to commit genocide; and (e) Complicity in genocide."

316.    The concept of liability for conspiracy or aiding and abetting is well-developed in international law. Under international law, one is responsible for a crime which is committed when that party provides "knowing practical assistance or encouragement which has a substantial effect on the perpetration of the crime."

317.    Under the Allied Control Council Law No. 10 (Dec. 20, 1945), criminal liability extends not only to principals who committed acts of genocide or war crimes but also to those who were connected with any plans or enterprises involving the commission of such crimes.

318.    Under the Agreement for the Prosecution and Punishment of Major War Criminals of the European Axis, and Establishing the Charter of the Military Tribunal, 82 U.N.T.S. 279, "leaders, organizers, instigators, and accomplices participating in the formulation or execution of a common plan or conspiracy to commit any of the foregoing crimes are responsible for all acts performed by any persons in execution of such a plan."

319.    Defendants aided and abetted, were complicit in, participated in, and conspired to commit, the planning, preparation and execution of genocide. Defendants did so by providing organized and systematic financial and other practical assistance and support to Hezbollah.

320.    Defendants' conduct had a substantial effect on Hezbollah's perpetration of genocide. The Defendants engaged in this unlawful conduct with knowledge that their actions would assist Hezbollah in the commission of genocide.

321.    Plaintiffs and their family members suffered death or serious physical and/or mental injuries as a proximate result of Defendants' conduct, for which they now sue.

322.    As a consequence of Defendants' conduct, each Plaintiff is entitled to damages in an amount to be determined at trial.

323.    Defendants' acts were deliberate, willful, intentional, wanton, malicious, and oppressive, and should be punished by an award of punitive damages in an amount to be determined at trial.

**SECOND CAUSE OF ACTION**
**PURSUANT TO THE ALIEN TORT CLAIMS ACT**
**FINANCING OF TERRORISM IN VIOLATION OF THE LAW OF NATIONS**

324.    Plaintiffs incorporate herein by reference the allegations contained in the preceding paragraphs.

325.    The crime of terrorist financing violates on a clear and definite norm of international law that is universally accepted by the civilized world.

326.    As discussed above, the Terrorism Financing Convention is a declaration of the law of nations. The Terrorism Financing Convention follows the precedents set by numerous other sources of international law that reflect the universal condemnation of terrorist financing.

327.    The Terrorism Financing Convention defines offenses by incorporating eleven existing anti-terrorism conventions. Thus, a Terrorism Financing Convention offense includes providing or collecting funds for any act falling within Terrorist Bombing Convention.

328.    Terrorism Financing Convention offenses also encompass providing or collecting funds for "any other act intended to cause death or serious bodily injury to a civilian, or to any other person not taking an active part in hostilities in a situation of armed conflict, when the purpose of the act, by its nature or context, is to intimidate a population, or to compel a government or an international organization to do or to abstain from doing any act."

329.    The Terrorism Financing Convention explicitly provides that liability for terrorist financing reaches those that directly or indirectly provide or collect funds with the intention or knowledge that the funds will be used to carry out a defined terrorist offense, regardless of whether

the funds were actually used. Specifically, the Convention reaches every accomplice and every person who organizes or directs others in the terrorist financing effort.

330.     As described above, Defendants aided and abetted, intentionally facilitated, and/or recklessly disregarded violations of international law, including, terrorism financing, by directly or indirectly providing funds to Hezbollah with the intention or knowledge that those funds would be used to carry out an offense as defined by the Terrorist Financing Convention, the Terrorist Bombing Convention and international law.

331.     Plaintiffs and their family members suffered death or serious physical and/or mental injuries as a proximate result of Defendants' conduct, for which they now sue.

332.     As a consequence of Defendants' conduct, each Plaintiff is entitled to damages in an amount to be determined at trial.

333.     Defendants' acts were deliberate, willful, intentional, wanton, malicious, and oppressive, and should be punished by an award of punitive damages in an amount to be determined at trial.

**THIRD CAUSE OF ACTION**
**PURSUANT TO THE ALIEN TORT CLAIMS ACT**
**AIDING AND ABETTING AND CONSPIRACY TO COMMIT**
**A VIOLATION OF THE TERRORIST BOMBING CONVENTION**

334.     Plaintiffs incorporate herein by reference the allegations contained in the preceding paragraphs.

335.     The crime of unlawfully and intentionally delivering, placing, discharging, or detonating an explosive or other lethal device in a place of public use, a State or government facility, a public transportation system or an infrastructure facility, where the actor intends to cause death, serious bodily harm, or major economic loss violates a treaty of the United States and a clear and definite norm of international law that is universally accepted by the civilized world.

336.     The Terrorist Bombing Convention is a treaty of the United States and is a declaration of the law of nations.

337.     As detailed above, Defendants aided and abetted and conspired with Hezbollah to unlawfully and intentionally deliver, place, discharge, or detonate an explosive or other lethal device in a place of public use, a state or government facility, a public transportation system or an infrastructure facility.

338.     Alternatively, Defendants participated as accomplices, directed others, and otherwise contributed to Hezbollah's terrorist bombing at the Burgas airport.

339.     The Defendants intended to cause death, serious bodily harm, or major economic loss.

340.     Plaintiffs and their family members suffered death or serious physical and/or mental injuries as a proximate result of Defendants' conduct, for which they now sue.

341.     As a consequence of Defendants' conduct, each Plaintiff is entitled to damages in an amount to be determined at trial.

342.     Defendants' acts were deliberate, willful, intentional, wanton, malicious, and oppressive, and should be punished by an award of punitive damages in an amount to be determined at trial.

**FOURTH CAUSE OF ACTION**
**PURSUANT TO THE ALIEN TORT CLAIMS ACT**
**AIDING AND ABETTING AND CONSPIRACY TO COMMIT**
**A VIOLATION OF THE MONTREAL CONVENTION**

343.     Plaintiffs incorporate herein by reference the allegations contained in the preceding paragraphs.

344.     The crime of carrying out a terrorist attack against an airport serving international civil aviation violates a treaty of the United States and a clear and definite norm of international law that is universally accepted by the civilized world.

345.     The Montreal Convention is a treaty of the United States and is a declaration of the law of nations.

346.     As detailed above, Defendants aided and abetted and conspired with Hezbollah to unlawfully and intentionally use a device, substance, or weapon to (a) perform an act of violence against a person at an airport serving international civil aviation which causes or is likely to cause serious injury or death; or to (b) destroy or seriously damage the facilities of an airport serving international civil aviation or aircraft not in service located thereon or disrupts the services of the airport, in violation of the Montreal Convention.

347.     Plaintiffs and their family members suffered death or serious physical and/or mental injuries as a proximate result of Defendants' conduct, for which they now sue.

348.     As a consequence of Defendants' conduct, each Plaintiff is entitled to damages in an amount to be determined at trial.

349.     Defendants' acts were deliberate, willful, intentional, wanton, malicious, and oppressive, and should be punished by an award of punitive damages in an amount to be determined at trial.

**FOURTH CAUSE OF ACTION**
**PURUSANT TO THE TORTURE VICTIM PROTECTION ACT**
**AIDING AND ABETTING AND CONSPIRACY TO COMMIT EXTRAJUDICIAL**
**KILLINGS, ATTEMPTED EXTRAJUDICIAL KILLINGS, AND TORTURE**

350.     Plaintiffs incorporate herein by reference the allegations contained in the preceding paragraphs.

351.    For decades, Hezbollah has functioned as a "state within a state" in Lebanon, controlling and governing large areas of the country (including some of the borders), and fielding military forces far more powerful than Lebanon's own army.

352.    Additionally, Hezbollah's domination and control over the Lebanese government are well-documented. For example, Newsweek magazine reported in 2018 that "Hezbollah is seizing the [Lebanese] state's institutions one by one ... Slowly but surely, [Hezbollah] is clearing its own path towards full control of Lebanon's government." According to Faysal Itani, a senior fellow and counter-terrorism expert at the Atlantic Council in Washington, D.C., "I do not see [Hizballah] as separate from the Lebanese government." Lebanon's justice minister resigned in 2016, citing what he called Hezbollah 's "domination" of the country's government. According to a White House national security official, "[f]or decades, this terrorist organization [Hezbollah] has tried to disguise its murderous intentions under the guise of political legitimacy." *See* "It's time to Mobilize a Global Response to the Terrorist Group Lebanese Hizballah," (Oct. 10, 2017), available at https://www.whitehouse.gov/articles/time-mobilize-global-response-terrorist-group-lebanese-hizballah. The White House national security official further noted that "[t]oday, Hizballah and its political allies hold half of the seats in Lebanon's Cabinet and nearly half of the seats in its National Assembly," while concluding that "[t]he same Hizballah officials responsible for its political apparatus oversee its terrorist planning." *Id*.; a*ccord* Tony Badran, *Lebanon Is Another Name for Hezbollah*, Found. Def. Democracy (July 26, 2017), http://www.defenddemocracy.org/media-hit/lebanon-is- another-name-for-hezbollah ("Hezbollah, of course, controls the Lebanese government. … The Lebanese state, in other words, is worse than a joke. It' s a front….").

353.    While Hezbollah is not a recognized foreign state, it exercises such extensive governmental control in Lebanon, both as an independent governing entity and through its control

over the Lebanese government, that Hezbollah's acts described herein constitute actions carried out "under actual or apparent authority, or color of law" within the meaning of the Torture Victim Protection Act. *Kadic v. Karadzic*, 70 F.3d 232 (2d Cir. 1995).

354.    The Burgas Airport Attack constitutes an act of extrajudicial killing, attempted extrajudicial killing and torture as defined by the Torture Victim Protection Act.

355.    The Burgas Airport Attack, including the murder of decedents Amir Menashe, Elior Preis, Maor Haroush, Yitzckak Kolangi, and Kochava Shriki, and the attempted murder and the torture-by-bombing of the Plaintiffs, was not authorized by any court or judgment.

356.    The Defendants aided and abetted and conspired with Hezbollah to carry out the Burgas Airport Attack, which was a violation of the TVPA.

357.    Plaintiffs and their family members suffered death or serious physical and/or mental injuries as a proximate result of Defendants' conduct, for which they now sue.

358.    As a consequence of Defendants' conduct, each Plaintiff is entitled to damages in an amount to be determined at trial.

359.    Defendants' acts were deliberate, willful, intentional, wanton, malicious, and oppressive, and should be punished by an award of punitive damages in an amount to be determined at trial.

**WHEREFORE**, the Plaintiffs respectfully request judgment be entered in their favor, against defendants Abou Jaoude, Hamdoun, and Safa, jointly and severally, as to each of the causes of action enumerated above, as follows:

a.   For all compensatory damages in an amount to be determined at trial;

b.   For all awards, sums, and other relief available pursuant to 28 U.S.C. § 1350 and § 1350 (note), or other applicable law, including but not limited to punitive damages, costs, expenses, and attorneys' fees;

c.   For all recoverable pre-judgment and post-judgment interest;

d.   For punitive and/or exemplary damages; and

e.   Such further relief as the Court finds just and equitable.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury on all issues so triable.

Dated this 3rd day of April, 2023.

/s/ Asher Perlin____
**ASHER PERLIN**
4600 Sheridan Street
Suite 303
Hollywood, Florida 33021
786-233-7164
asher@asherperlin.com

*Attorney for Plaintiffs*